921 P.2d 655

STATE of Arizona, Appellee,

v.

David O'Neal HYDE, Appellant.

No. CR-92-0289-AP.

Supreme Court of Arizona,
En Banc.

July 9, 1996.

Grant Woods, Attorney General, Phoenix
by Paul J. McMurdie, Chief Counsel Crimi-

nal Appeals Section, Kent E. Cattani, Assistant Attorney General, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Paul J. Prato, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

ROBERT J. CORCORAN, Justice (Retired).

David O'Neal Hyde (defendant) was convicted on two counts of first degree premeditated murder and one count of first degree burglary. Judge John H. Seidel sentenced defendant to death on each of the first degree murder convictions and to an aggravated 15–year sentence on the burglary conviction. All sentences were to run consecutively. This is an automatic appeal of the convictions and sentences, pursuant to Rules 26.15 and 31.2, Arizona Rules of Criminal Procedure. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3), and A.R.S. § 13–4031. We affirm defendant's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

John Lee, Sr. and his daughter, Ginger, were murdered at the Joyland Market in Phoenix on March 8, 1991. John Lee had owned and operated the Joyland Market since 1943. Ginger, an elementary school teacher, often helped out in the evenings. Depending on the amount of evening business, the market usually closed between 7:00 p.m. and 8:00 p.m. Family members discovered the victims' bodies about 11:15 p.m. the night of March 8. Lee was 74 when he died. Ginger was 50.

Both victims sustained multiple lacerations and bruising and died as a result of blunt force injuries to the head. A blood spatter expert testified at trial that one person inflicted the fatal wounds to both victims. According to the medical examiner's testimony, if a wound was "consistent with" a certain object, then that object could not be scientifically excluded as the source of the wound. The medical examiner testified that the lacerations were consistent with a blunt, sharp instrument, such as an ax, cleaver, or long knife, and that the blunt force wounds were consistent with a pipe or with the hilt of a knife. Specifically, both the lacerations and the blunt force wounds were consistent with the blade and/or hilt of a Bowie knife with a 10″ blade. The wounds were not consistent with any of the heavy knives that were in the store, nor were any heavy knives obviously missing from the store.

A large Bowie knife was found in defendant's possession when he was arrested. Although no physical evidence directly linked defendant to the scene of the murders (the police discovered 7 latent fingerprints at the scene, none of which were identifiable), a towel found at the scene contained a blood swipe consistent with the blade of a knife.

Other than in the immediate area inside the Joyland Market where each body was discovered, there was no evidence of a struggle. There was, however, some evidence that a theft had occurred on the premises. A receipt found in the cash register showed that someone had rung up many items but had not totalled them. Additionally, neither the cash register drawer nor Lee's pockets, in which he usually carried several hundred dollars, contained any paper money, and Ginger's purse was missing.

About March 4, defendant and his half-brother, Jake Johnson, moved from Mesa to their parents' home near the Joyland Market in Phoenix. On March 6, defendant informed his ex-wife that he and Jake planned to move to Wichita, Kansas, on March 9. Consequently, his ex-wife allowed defendant to keep their son until March 9. On March 8, however, defendant called his ex-wife to say that he wanted to return their son early because defendant and Jake would be leaving for Wichita that evening. Around 6:00 p.m. on March 8, defendant left his parents' home and went to his ex-wife's house in Mesa, arriving around 6:30 p.m. He stayed for approximately 35 minutes.

A mutual friend of defendant and Jake testified at trial that the two brothers came to his house in separate vehicles around dusk on March 8. Defendant drove a light blue Buick, and Jake drove a dark green International Travel–All. Jake was wearing a plaid shirt, defendant was wearing a black jacket,

and both men wore tennis shoes. Defendant and Jake stayed at the friend's house for only 5 to 7 minutes then left in the blue Buick, leaving the Travel–All behind. Jake returned about an hour and a half later but again stayed for only a few minutes.

Defendant's mother testified that defendant and Jake arrived at her home between 8:05 and 8:20 p.m., watched a movie until around 9:45 p.m., then left, apparently for Wichita, with most of their possessions in the Travel–All. The mutual friend testified, however, that around midnight defendant and Jake returned again to his house, the three men then went to shoot pool until about 2:30 a.m., and neither defendant nor Jake mentioned leaving for Wichita.

The next day, March 9, defendant and Jake returned to their parents' house between 8:30 and 9:00 a.m. The evening of March 10, they finally left for Wichita, travelling in their two vehicles. They arrived on March 12 and stayed with a local couple and the couple's two young children.

On March 10, an anonymous informant told the Phoenix police by telephone that Jake and an African–American man named Kevin were involved in the murders. Police canvassed the area near the store and obtained a description of Jake as a caucasian male whose parents lived in the neighborhood. Kevin contacted the Phoenix police later that evening and consented to a police search of his bungalow. The state apparently did not charge Kevin in relation to these events.

On March 11, police learned that a married couple who lived in a trailer park near the Joyland Market (trailer park witnesses) claimed to have seen two white men near the Joyland Market at approximately 7:15 p.m. on the evening of March 8. According to these witnesses, one man was taller than the other. The taller man was 20 to 25 years old, 5'8" to 5'10" tall, very slender at 125 to 130 pounds, of medium complexion, had dark brown shoulder-length curly hair, was clean-shaven, and was wearing a dark blue jacket. The witnesses described the other man as between 40 and 50 years old, 5'10", 160 pounds, light-skinned, with red curly hair, and as wearing a black and red flannel shirt.

Jake generally fit the second description, except he was only 23 years old. Defendant, however, did not match the first description. After he was arrested, defendant described himself as 6'0" or 6'1", 28 years old, weighing 160 to 162 pounds, and he had long brown hair, a beard, and a mustache.

On March 13, officers learned from an interview with defendant and Jake's former roommate that the brothers had moved to Wichita on March 10. The Phoenix police requested corroborating information from the Wichita police, who discovered that Jake was a suspect in several Wichita misdemeanor assaults. On March 15, the lead investigating detective in Phoenix again contacted the trailer park witnesses and separately showed them two photographs, one of defendant and one of Jake. While showing defendant's photograph, the detective placed his thumb over defendant's beard in the photograph because the female witness described a man with no facial hair. The female witness identified both Jake and defendant, and the police then focused their investigation on the two brothers.

The Phoenix police later informed the Wichita police that they expected to obtain arrest warrants for both Jake and defendant in connection with a car robbery and assault. We set forth the facts relating to the car robbery and arrest warrant *infra* Part I. About 6:00 p.m. Phoenix time on March 15, a Phoenix police officer informed the Wichita police that the warrants were available on the Federal Bureau of Investigation's National Crime Information Center data system.

Around 9:00 p.m. Phoenix time, Wichita police located the Travel–All. They planned to wait through the night and to arrest defendant and Jake the next morning, but in the early morning hours of March 16 defendant and one of their hosts left the hosts' house in defendant's car. Wichita police officers followed them, and a few minutes later the detective in charge of the surveillance team ordered the tailing officers to make a routine traffic stop to determine who was in the vehicle. About 3:15 a.m. Phoenix time, Wichita police arrested defendant in his car.

The Wichita police later arrested Jake inside the hosts' house. Police then obtained consent from one of the hosts to search their home and to seize defendant's and Jake's possessions, resulting in seizure of various clothing items from the residence. In addition, the police impounded each brother's vehicle.

On March 17, with two Phoenix police detectives observing, Wichita police conducted an inventory search of each car. On the back seat of the blue Buick, the police found a black jacket that a trial witness later identified as the same jacket that defendant had worn the night of the murders. In the Travel–All, police found a Bowie knife with a 7″–8″ blade in a box with other debris. In addition, police found plaid shirts.

Police also conducted a luminol test in the blue Buick, which was positive for blood on the driver's side of the front seat.[1] A forensic chemist later conducted a benzidine test for blood on the front and back seats of the Buick and on some of the clothing seized at the hosts' residence. As a result of the luminol test, the police had cut some material from the front seat where they found a small amount of blood. The benzidine test on this material did not reveal the age of the blood or whether it was human or animal. A black down jacket also had a blood smear across the front and on the right sleeve, and the benzidine test was positive for human blood but did not reveal the blood type. Tests also revealed blood on the brown jacket that defendant was wearing when he was arrested. The tests did not reveal any blood on other clothes. The Bowie knife, however, later tested positive for a small amount of blood on the blade very close to the hilt.

On March 17, Phoenix police detectives interviewed defendant in Wichita. Before interviewing him, the police read defendant his *Miranda* rights, and he stated that he understood them. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A redacted tape of defendant's interrogation was played at trial for the jury, and the jury received transcripts of the redacted version.

The facts that emerged from the parts of the interview that the jury heard were as follows. Defendant arrived at his ex-wife's house in Mesa about 6:30 p.m. on March 8 and stayed there for 10 to 15 minutes. In addition, defendant told the detectives that he suffered from blackouts induced from substance abuse, specifically that he could not remember anything that occurred before he and Jake left for Wichita the night of March 8. They left for Wichita in separate vehicles sometime between 9:00 a.m. and 11:00 p.m., but the Travel–All broke down that night, and they parked it in the area of 40th Street and McDowell Road. Defendant did not mention going to their friend's house that night or playing pool. Rather, he said that he and Jake slept at their parents' house. He also described his Bowie knife, said that its blade was dull, and that, as far as he knew, Jake had never used it.

After further questioning, defendant eventually said that he remembered being at the Joyland Market, pushing a shopping cart to the front of the store where Lee was at the cash register, then hearing shouting at the back of the store when Ginger apparently caught Jake trying to steal her purse, and that Jake then hit Ginger, turned off the lights in the store, and "went wild."

The next morning, however, after again receiving his *Miranda* rights and again stating that he understood them, defendant recanted his statement from the previous evening. He said he was recanting his earlier statement because his parents had refreshed his memory during a telephone conversation

1. Luminol is a substance that produces light when it comes in contact with blood. At a pretrial hearing, the prosecutor stated in response to a question by the court that the luminol test was conducted under a separate search warrant. A Phoenix police detective also testified that there was a separate search warrant for this test. No search warrant was marked or admitted into evidence, and the prosecutor later was uncertain whether there was a warrant. The court left the issue open if the defense wished to raise it again when evidence was introduced at trial. At trial, the state presented testimony regarding a subsequent test for blood and did not present testimony on the initial luminol test. Defendant did not object to the testimony presented. Defendant's only motion with regard to blood testimony was with regard to blood found on the jacket and was denied. Defendant has not raised any issues on appeal relating to blood evidence.

after police had questioned him the night before. In the second interview, defendant stated that he was not at the Joyland Market the night of March 8 but that Jake had a friend who looked a lot like defendant and who might have been involved in the murders with Jake. Defendant said he arrived in Mesa with his son at 6:30 p.m. and that he was at the Circle K across the street from the Joyland Market at 8:00 p.m., where he observed that the market's lights were still on. In addition, he said that he arrived at his parents' house about 8:00 p.m., that Jake arrived about 30 minutes later, and that they stayed at his parents' house until they left for Wichita about 9:30 p.m. They parked the Travel–All at 40th Street and Thomas Road after it broke down, then picked up their friend at his house. Defendant admitted having a Bowie knife that was in a box in the Travel–All and stated that he had not used the Bowie knife to cut meat or anything else that would have resulted in having blood appear on the hilt.

After defendant was transferred to Phoenix, he spoke to another prisoner, who testified at trial to the following scenario. Defendant and Jake went into the Joyland Market to get food for the trip to Wichita while discussing their need for money. While they were in the store, a struggle started between Jake and Ginger at the back of the store as Lee was ringing up items for defendant at the front of the store. Lee moved toward the back of the ·store when he heard the commotion. Defendant grabbed Lee from behind and struck him on the head with his Bowie knife. Lee struggled with defendant, however, and managed to get to the back of the store. Jake, having subdued Ginger, then joined defendant. Defendant struck Lee several times on the head with his Bowie knife until he could see bone and Lee was bleeding profusely. Jake then "flipped out"

and beat both Lee and Ginger on the head with a piece of metal pipe. Afterward, Jake turned off the store lights and turned around the "closed" sign. ·The two men then stole Ginger's purse and the groceries they had collected. They stole approximately $700. They tried to wipe their fingerprints from the cash register and other areas of the store. Defendant then wiped the blood off the Bowie knife. After defendant and Jake left the store, Jake walked to their parents' home, and defendant drove there. They changed clothes in the Travel–All. They washed their clothes and spent the night somewhere in Tempe. Defendant hid his Bowie knife in a box in the Travel–All.

Defendant and Jake each were charged with two counts of first degree murder (both premeditated and felony), one count of first degree burglary with regard to the Joyland Market, and one count of class 3 theft with regard to the unrelated car robbery.[2] The trial court severed defendant's and Jake's trials. In addition, the trial court severed defendant's car robbery count from the murder and burglary counts. Before defendant's trial, Jake was tried on two counts of first degree murder and on one count of first degree burglary and was acquitted on all counts. For purposes of this opinion, however, we continue to identify Jake as an accomplice because defendant so identified him. The car robbery charges against defendant were dismissed before his trial on the murder and burglary charges. Jake eventually pleaded guilty to a theft charge related to the car robbery.

The jury found defendant guilty of both counts of first degree premeditated murder and first degree burglary (dangerous offense). The court denied defendant's motion for a new trial.[3] After a presentence hear-

---

2. *See infra* Part I. The original complaint charged defendant with robbery under A.R.S. §§ 13–1901, –701, –702, –801, and –812. For the same alleged offense, defendant was later charged with theft under A.R.S. §§ 13–1802, –1801, –701, –702, –801, and –812. For consistency, we refer to the alleged offense as the "car robbery" or "robbery."

3. Defendant's motion for a new trial claimed that he had received ineffective assistance of counsel

because his lead counsel, who was retained the day jury selection began, was not prepared for trial and "demonstrated complete lack of familiarity with the defendant's case." This motion was filed by Jose de la Vara, co-counsel to defendant's lead trial counsel, Duane Varbel. The trial court denied the motion without prejudice, reasoning that this court's decision in *State v. Marlow* precluded de la Vara from claiming the ineffective assistance of his co-counsel. 163 Ariz. 65, 68, 786 P.2d 395, 398 (1989) ("[I]t is

ing, the court sentenced defendant to a 15–year aggravated sentence on the burglary conviction. With regard to the murder convictions, the court found beyond a reasonable doubt the existence of 3 aggravating circumstances: (1) that the murders were committed to obtain pecuniary gain, A.R.S. § 13–703(F)(5); (2) that the murders were committed in an especially heinous and depraved manner, § 13–703(F)(6); and (3) that the murder of each victim occurred during the murder of the other, § 13–703(F)(8). The court did not find any statutory or non-statutory mitigating circumstances sufficiently substantial to call for leniency. The court therefore sentenced defendant to death on both murder convictions and ordered that all sentences run consecutively. The court also ordered defendant to pay restitution and a mandatory assessment.

## ISSUES PRESENTED

Defendant does not present any issues specifically related to his conviction and sentence on the burglary charge. He does present 7 issues generally related to pretrial or trial rulings, two death penalty sentencing

inappropriate for counsel to claim that his or her own conduct of the trial or the conduct of co-counsel was not reasonably effective."). Although defendant has not raised on this appeal any issues concerning the denial of his motion for a new trial, ineffective assistance of counsel, or *conflict of interest, he has preserved those* issues. We do not decide whether the trial court correctly applied *Marlow* to this case.

However, we believe that certain facts should be pertinent to any future litigation of the effectiveness of defendant's trial attorneys, and we recite those facts here. Duane Varbel represented Jake Johnson during the pretrial proceedings before defendant's and Jake's trials were severed. Mr. Varbel was lead counsel at Jake's trial, in which Jake was acquitted. Jose de la Vara was appointed by the court to represent defendant. He represented defendant during the pretrial proceedings, continued as defendant's co-counsel at trial, and represented defendant at the presentence hearing.

Hours before jury selection was supposed to begin for defendant's trial, Mr. de la Vara informed the trial court that Mr. Varbel would represent defendant as lead counsel. In a statement to the judge, defendant stated that "Duane Varbel has interviewed all witnesses and is prepared for trial." Nevertheless, defendant requested a one-day continuance so that Mr. Varbel could further prepare.

issues, and one general constitutional challenge to the death penalty.

### Pretrial and trial issues

I. Whether the trial court abused its discretion in finding that probable cause existed for the issuance of a robbery complaint and arrest warrant against defendant based on the unrelated car robbery incident.

II. Whether defendant's interrogation and search following his arrest can be sustained under the "good faith" exception to the 4th Amendment.

III. Whether the trial court's ruling limiting the scope of defendant's psychological expert's testimony violated defendant's state and federal due process rights.

IV. Whether the trial court unfairly prejudiced defendant's defense by permitting testimony that defendant had failed to fulfill child support obligations.

V. Whether the exclusion of venire persons from the jury panel based on their opinions about the death penalty violated the federal and state constitutions.

Defendant's motion for a new trial, prepared by Mr. de la Vara, stated that "since Mr. Varbel was not present, the court ruled that [Mr. de la Vara] would remain as attorney of record and jury selection would begin[;] however an attempt to locate Mr. Varbel, who was then in a civil trial elsewhere, would be made." This statement is imprecise. Indeed, Mr. Varbel was not present when defendant requested the continuance. However, he appeared soon after and also asked for a continuance and a copy of the transcript of Jake's trial from Mr. de la Vara. After Mr. de la Vara said he would provide any materials that Mr. Varbel wanted, Mr. Varbel suggested that Mr. de la Vara proceed with the jury selection that day. At that point, after Mr. Varbel was present and had suggested that jury selection begin that day, the court denied the continuance. Jury selection began that day with Mr. de la Vara representing defendant. Jury selection continued the next day with both Messrs. Varbel and de la Vara representing defendant. We emphasize that Mr. Varbel agreed to begin trial as scheduled and that he did not enter this case on a cold record. After the pretrial proceedings and Jake's trial, he had acquired extensive knowledge of both the factual and legal underpinnings of the case.

VI. Whether a jury instruction excluding "possible doubt" from the meaning of "reasonable doubt" violated the state and federal due process clauses.

VII. Whether the wording of the trial court's jury instruction on lesser included offense for first degree murder violates the state and federal due process clauses.

### Sentencing issues

VIII. Whether the evidence supports a finding beyond a reasonable doubt that the murders were committed in expectation of pecuniary gain.

IX. Whether the evidence supports a finding beyond a reasonable doubt that the murders were especially heinous or depraved.

### Constitutional challenge to the death penalty

Whether the Arizona death penalty statute violates the Eighth Amendment because it does not sufficiently channel the sentencer's discretion.

## *PRETRIAL AND TRIAL ISSUES*

## I. PROBABLE CAUSE

Defendant was arrested pursuant to an arrest warrant for an unrelated robbery. Before trial, defendant moved to suppress his statements in Wichita to the Phoenix police on the ground that his arrest was illegal and therefore that the statements were the fruits of the state's violation of his Fourth Amendment rights. Defendant has not argued that his statements were taken in violation of his *Miranda* rights. After a hearing, the trial court denied the motion. Defendant argues on appeal that the denial of his motion was prejudicial error.

Defendant's motion to suppress presented 3 alternative theories supporting his claim that his arrest was illegal: (1) the arrest warrant for robbery was a pretext designed to provide the Phoenix police with an opportunity to interview defendant about the Lee murders; (2) Phoenix police deliberately obtained the arrest warrant knowing that they did not have probable cause to believe that defendant committed the robbery; and (3)

the Wichita police arrested defendant without knowledge that the Arizona warrant had been issued.

The following facts relating to the validity of the arrest warrant were revealed during the hearing on pretrial motions. While investigating the Lee murders, the Phoenix police interviewed defendant and Jake's former roommate and learned that Jake had bragged about stealing a red Mustang convertible at knife point from a homosexual man and that Jake had at one time possessed the Mustang. Because the trial court severed the robbery count, evidence related to the Mustang robbery was not presented to the jury in this case.

In January 1991, a man had reported his red Mustang convertible stolen, and the vehicle was recovered about a week later. Police interviewed the car robbery victim, who described his assailant as a caucasian in his mid–20s, 6'1" and 160 pounds. The victim did not mention facial hair in his description. He recounted that he had met a man at the Nu–Town Saloon in Phoenix and that the two men had decided to leave together. On the way out of the bar, the victim's companion stopped to talk to a third man at the door. After the victim and his companion had left the bar in the Mustang, the companion instructed the victim to pull over, then struck him with a closed fist, took his wallet, pushed him out of the car, and drove away. Police examined the vehicle and found Jake's fingerprints in it. Police did not find defendant's fingerprints in the car.

Officers later re-interviewed the Mustang robbery and assault victim. From a photographic lineup consisting of 6 photographs of caucasian males, one of which depicted Jake, the victim tentatively identified Jake as resembling the man with whom his assailant stopped to talk on their way out of the bar. He also reaffirmed his description of the assailant. Because this description generally matched defendant's, police suspected that he, not Jake, was the assailant. Police also based their suspicion on the fact that the car was stolen near the brothers' parents' house.

Around 4:30 p.m. on March 15, Detective Michael Chambers, the lead investigator in

the double murder case, sought arrest warrants for Jake and defendant on theft and robbery charges respectively in connection with the car robbery. Det. Chambers presented a direct complaint to Maricopa County Superior Court Commissioner Toby M. Gerst. The complaint was based "on information and belief" and did not contain an accompanying affidavit.

Det. Chambers testified at the suppression hearing that he advised Commissioner Gerst, under oath, that he was the detective assigned to the case and that Commissioner Gerst asked if the complaint was based on a true and accurate statement of fact, to which Det. Chambers responded that it was. The complaint stated:

The complainant herein personally appears and, being duly sworn, complains on information and belief against DAVID O'NEAL HYDE, charging that in Maricopa County, Arizona:

DAVID O'NEAL HYDE, on or about the 5th day of January, 1991, in the course of taking property of another from [another's] person or immediate presence and against his will, used threats or force against [another], with the intent to coerce surrender of the property or to prevent resistance to DAVID O'NEAL HYDE's taking or retaining the property, in violation of A.R.S. §§ 13–3902, 13–3901, 13–701, 13–702, 13–801, and 13–812.

It is requested that a warrant be issued.

The complaint was signed by Paul V. Rood, Deputy County Attorney, and by Det. Chambers.

Judge Colin F. Campbell, who ruled on the pretrial motions, found that the probable cause issue was a close question and stated that "[i]n all candor, if this issue was presented to me for an original determination with respect to probable cause, this court would not find probable cause [based on the record before me now] for the issuance of an arrest warrant...." However, he determined that "a neutral and independent magistrate of this court on a close question made a decision

that there was sufficient probable cause to issue an arrest warrant." Judge Campbell thus denied defendant's motion on the basis that the magistrate acted in accordance with the Arizona Rules of Criminal Procedure and that, even if the magistrate failed in her duty, the police had a good faith basis to believe that there was probable cause. He also found that the fact that some of the arresting officers may not have known about defendant's arrest warrant was not constitutionally significant.[4]

On appeal, defendant claims that the trial court erred in sustaining Commissioner Gerst's issuance of a complaint and warrant against him. He mainly rests his evidentiary arguments on Det. Chambers's testimony at the suppression hearing that he could not recall whether Commissioner Gerst questioned him about the nature of the "information and belief" on which the complaint against defendant was based. Based on this testimony, defendant argues that Commissioner Gerst failed to inquire into the source of the detective's information and the basis for his belief. Neither party, however, called Commissioner Gerst to testify at the suppression hearing.

### A. Standard of review.

■ We review the facts in the light most favorable to sustaining the trial court's ruling on a motion to suppress, and we will not disturb its ruling absent clear and manifest error. *State v. Stanley*, 167 Ariz. 519, 523, 809 P.2d 944, 948 (1991); *State v. Gerlaugh*, 134 Ariz. 164, 167, 654 P.2d 800, 803, supplemented, 135 Ariz. 89, 659 P.2d 642 (1983).

### B. The parties' relative evidentiary burdens.

■ Neither defendant nor the state directly addressed the allocation of the burden of proof on defendant's motion to suppress. However, in its opposition to defendant's motion, the state apparently assumed that it carried the burden of going forward as well as the burden of proving by a preponderance

---

4. Before trial, the court also found that the state met its burden of proving that defendant made his statements voluntarily. A.R.S. § 13–3988; *Ryan v. Superior Court*, 121 Ariz. 385, 387, 590

P.2d 924, 926 (1979); *State v. Alvarado*, 121 Ariz. 485, 488, 591 P.2d 973, 976 (1979) (the state has the burden of showing that a defendant's statements are freely and voluntarily made).

of the evidence that the statements had been obtained legally: "The State will prove [that] adequate facts and evidence were developed [through the police investigation], and that such facts were fairly and accurately presented to [the] Superior Court magistrate...." *See* rule 16.1(b), Arizona Rules of Criminal Procedure.[5] Although the trial court also did not address the burden of proof, the suppression hearing proceeded in an order consistent with the state's assumption. We hold that defendant bore the burden of going forward with specific evidence that his statements should be suppressed.

### 1. The scope of rule 16.2(b).

Since we adopted the Arizona Rules of Criminal Procedure in 1973, we have not addressed whether a defendant seeking to suppress evidence obtained as the result of an allegedly invalid arrest warrant bears the burden of going forward with evidence to establish a prima facie case. At the time of defendant's trial, rule 16.2(b) stated:

> The prosecutor shall have the burden of proving, by a preponderance of the evidence, the lawfulness in all respects of the acquisition of all evidence which the prosecutor will use at trial. However, whenever the defense is entitled under Rule 15 to discover the circumstances surrounding the taking of any evidence by confession, or search and seizure, or defense counsel was present at the taking, or the evidence was obtained pursuant to a valid search warrant, the prosecutor's burden of proof shall arise only after the defendant has come forward with evidence of specific circumstances which establish a prima facie case that the evidence taken should be suppressed.

Rule 16.2(b), 174 Ariz. at LXXV (1993).

■ Rule 16.2(b) differentiates between the burden of persuasion and the burden of going forward. The burden of persuasion, as its name implies, requires the party that bears it to persuade the trier of fact to rule in its favor. *See generally*, 5 Wayne R. LaFave, *Search & Seizure* § 11.2(b), at 37

(3d ed. 1996). The burden of going forward, in contrast, requires the party that bears it to produce sufficient preliminary evidence *before* the party with the burden of persuasion must proceed with its evidence. *Id.* Thus, failure to meet the burden of going forward results in an adverse ruling before presentation of evidence by the party with the burden of persuasion.

■ Under rule 16.2(b), the burden of persuasion originates and remains with the state. *See also State v. Hocker,* 113 Ariz. 450, 455 n. 1, 556 P.2d 784, 789 n. 1 (1976) (burden of proof under rule does not shift to defendant). However, when a defendant moves to suppress evidence that the state has obtained under defined circumstances, the burden of going forward rests on the defendant. Rule 16.2(b).

Here, we must decide whether defendant had the burden of going forward, and if so, the extent of that burden. Under rule 16.2(b), in order for the prima facie case requirement to apply to a defendant's motion to suppress, the state must have obtained the challenged evidence in at least one of two ways: (1) by confession, or (2) by search and seizure. If so, then one of the following 3 conditions also must exist: (1) rule 15 allows the defendant to discover the circumstances of the taking of the evidence; (2) defense counsel was present during the taking of the evidence; or (3) the state took the evidence pursuant to a valid search warrant.

In this case, the first part is twice satisfied. The state obtained the challenged evidence by confession, and it obtained the confession as a result of defendant's arrest (seizure). Thus, we turn to the 3 conditions that constitute the second part.

The first condition is fulfilled if rule 15 would allow defendant to discover "the circumstances surrounding the taking" of certain evidence. Rule 15 is a mandatory disclosure rule that directs the state and the defense to provide each other with certain categories of tangible and intangible information but does not explicitly require disclo-

---

**5.** Most of the rules that we cite in this opinion are Arizona Rules of Criminal Procedure. In the interest of brevity, we refer to specific Arizona

Rules of Criminal Procedure simply by "rule" and to other rules by their full names.

sure of the circumstances surrounding the *taking* of such information.

Rule 15.1(b), however, does require the state to disclose any material or information regarding certain collateral issues, specifically the use of electronic surveillance, the execution of a search warrant, or, subject to defined exceptions, the involvement of an informant. The comment to rule 15.1(b) further explains that: "To implement the pretrial motion requirements of Rules 16.1, 16.2 and 16.3, the prosecutor is required to notify the defendant of *all potential collateral issues not already revealed by the Rule 15.1(a) disclosures.*" (Emphasis added.) Thus, although rule 15.1(b) is facially limited to specific categories of collateral issues, the comment indicates that this subsection applies to a wider scope of collateral issues and that its purpose is linked to rule 16.

The proposed versions of the rules provide some insight into the significance of the comment to rule 15.1(b). *See* Arizona Proposed Rules of Criminal Procedure, published by the Arizona State Bar Committee on Criminal Law (Professor Charles E. Ares, Chair), July 15, 1972 (Proposed Rules). Proposed rule 15.1(b) elucidated the committee's original purpose in fashioning that rule, its comment, and rule 16.2(b). Proposed rule 15.1(b), in addition to the use of electronic surveillance, the execution of a search warrant, and the involvement of an informant, also required the state to furnish a defendant with information and material relevant to "the acquisition of any statement of the defendant disclosed under Rule [15].1(a)(2)." *See* Proposed rule 16.1(b)(7).[6] Rule 15.1(a)(2), as proposed and adopted, requires the state to disclose any statement made by a defendant or by a co-defendant. Proposed rule 15.1(b) therefore would have expanded rule 15.1(a)(2) to require disclosure of any material and information related to how the statements were obtained. Proposed rule 16.1(b) was identical to the adopted rule in that it required a defendant to make a prima facie case if rule 15 allows discovery of the circumstances surrounding the taking of the

challenged evidence. Thus, the rules committee intended that challenges to evidence taken as the result of the execution of an arrest warrant would trigger the prima facie case requirement where a defendant moves to suppress his or her post-arrest statements on the ground that the arrest was illegal.

This conclusion is further bolstered by the rules committee's original statement of the purpose of rule 16.2(b). Under a pre-rules decision of this court, the state carried the burden "to establish from all the circumstances surrounding the pretrial identification that it was not such as to be unduly suggestive." *State v. Dessureault,* 104 Ariz. 380, 384, 453 P.2d 951, 955 (1969). The rules committee reasoned that the state's heavy burden under *Dessureault* was no longer justified because the new discovery rules would level the information-gathering playing field between the prosecution and the defense. The committee's logic extended not only to identification but also to any possible collateral issue that would require the state, under rule 15.1(b), to disclose pertinent material and information to the defense:

> [U]nder Rule [15], defense counsel is entitled to significant discovery concerning *any issue which can be the subject of a collateral suppression motion.* Under these conditions, the defense should be required to specify with particularity the grounds on which it claims prejudice, and to present evidence in support of them. Once the defense establishes a *prima facie* case, the burden returns to the prosecution to prove the lawfulness of the acquisition of the challenged evidence.

Rule 17.2(b) cmt., Proposed Rules (emphasis added).

Despite the committee's intentions, the statement provision of rule 15.1(b) did not appear in the adopted rule. We conclude, however, that the comment to rule 15.1(b) as adopted sufficiently put the defense on notice that a challenge to a facially valid arrest warrant would trigger the prima facie case requirement. Indeed, our analysis of defendant's motion to suppress and of the suppres-

---

6. In the Proposed Rules, discovery was covered by rule 16; in the adopted rules, rule 16 became rule 15, and rule 17 became rule 16.

sion hearing convinces us that the rules of discovery operated in this case as they were designed to operate. Before he filed his motion to suppress, defendant had adequate information available to enable him to allege lack of probable cause, and the defense was prepared to elicit testimony from Det. Chambers about the probable cause proceedings. This is the exact situation that the rules committee envisioned when it proposed rule 16.2(b). According to some commentators, it is unfair to place the burden of going forward on the defendant because of the informational advantage that the state enjoys. William C. Moul, Comment, *Probable Cause: The Federal Standard*, 25 Ohio St. L.J. 502, 528 (1964). In this case, however, defendant and the state were on level informational ground.

Moreover, the prima facie case requirement of rule 16.2(b) also operated in this case through rule 15.1(b)(2), which requires the state to disclose material and information relating to the execution of a search warrant. By the same token, the prima facie case requirement arose under the third condition of rule 16.2(b): confession or search and seizure evidence taken pursuant to a valid search warrant. Search warrants and arrest warrants are indistinguishable in this context. Both derive from the Fourth Amendment to the United States Constitution, and subsequently, from article II, § 8 of the Arizona Constitution. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. Our state constitution states: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Ariz. Const. art. II, § 8.

■ The purpose of the warrant requirement in both the search and the arrest contexts is to place a neutral magistrate between an " 'officer engaged in the often competitive enterprise of ferreting out crime' " and the constitutional safeguards on an individual's freedom from undue governmental intrusion. *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981), quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Although they serve the same constitutional purpose, arrest warrants and search warrants protect different interests: an arrest warrant protects a person against an unreasonable seizure, while a search warrant protects a person's privacy interests in his or her home or possessions. *Steagald*, 451 U.S. at 212–13, 101 S.Ct. at 1648.

■ The difference between a search warrant and an arrest warrant is irrelevant, however, to the issue of the burden of proof on motions to suppress. Rule 16.2(b) places the burden of going forward on the defendant in order to "avoid[ ] entirely the use of suppression motions as 'fishing expeditions.' " Rule 17.2(b) cmt., Proposed Rules. The danger of a "fishing expedition" is the same whether the state obtains evidence through a search warrant or through an arrest warrant. It would be illogical to conclude that a criminal defendant should bear the burden of going forward when challenging evidence obtained pursuant to a search warrant but not when challenging evidence obtained after execution of an arrest warrant.

■ We therefore hold that a motion under rule 16.2(b) to suppress evidence taken under authority of a valid arrest warrant requires a criminal defendant to make a prima facie case for suppression. We derive this requirement equally and independently from the interplay between rule 16.2(b) and the comment to rule 15.1(b) and from the coextensive nature of search warrants and arrest warrants in this context.

*2. The extent of the prima facie case requirement for challenges to evidence seized pursuant to a warrant.*

We now turn to what defendant was required to show to establish a prima facie case for suppression. Several cases guide our decision. In *State v. Greenawalt*, we noted

the defendant's duty to establish a prima facie case for suppression, but we decided without explanation that defendant had presented sufficient evidence. 128 Ariz. 150, 159, 624 P.2d 828, 837 (1981). In *State v. Hocker,* we were asked to consider whether the trial judge properly had required the defendant to make a prima facie case for suppression of evidence obtained as a result of her warrantless arrest. 113 Ariz. 450, 455, 556 P.2d 784, 789 (1976). We held that it was error for the court, having found that the evidence conflicted, to submit the matter to the jury, and, because we also held that the evidence was inadmissible on other grounds, we did not consider whether defendant should have had the burden of going forward. 113 Ariz. at 455, 556 P.2d at 789. In dictum, we stated that a defendant could make the required prima facie case by calling the weaknesses in the state's argument to the trial court's attention "through argument, legal theory or testimony." 113 Ariz. at 455 n. 1, 556 P.2d at 789 n. 1. However, in *State v. Fimbres,* 152 Ariz. 440, 442, 733 P.2d 637, 639 (App.1986), the court of appeals held that the defendant must present some evidence and that argument and legal theory are not sufficient to establish a prima facie case for suppression. *Fimbres* did not decide specifically what kind of evidence a defendant must present.

In *Kuhn v. Smith,* the court of appeals encountered an analogous burden of proof issue. 154 Ariz. 24, 25, 739 P.2d 1341, 1343 (App.1987). In that case, the state argued that the court of appeals should reinstate a challenged complaint because the defendant failed to show he was prejudiced by a complaint filed without probable cause. Although prejudice is assumed when a complaint is filed without a showing of probable cause, the court held that the defendant nevertheless had the burden of going forward, which he met by "produc[ing] evidence to dispel the [complaint's] presumption of regularity." 154 Ariz. at 27, 739 P.2d at 1344.

■ We impose the same burden on criminal defendants who seek to suppress evidence on the ground that an arrest warrant is invalid. A defendant must present sufficient evidence to dispel the warrant's presumption of regularity. This will usually require a showing that the magistrate's procedures in determining whether there was probable cause did not adequately safeguard the defendant's constitutional rights.

■ Our holding is in accord with *Callahan v. State,* 179 Ga.App. 556, 347 S.E.2d 269, 276–77 (1986). In *Callahan,* the affiant, a police officer, could not recall the details of his oral testimony before the magistrate, but neither side called the magistrate to testify. The court stated that the better practice would have been for the magistrate to record the testimony but that, absent such a requirement under state law, it was incumbent on the defendant to call the magistrate to testify at the suppression hearing because "[t]he burden falls upon [defendant] to show the absence of procedures sufficient to satisfy his constitutional rights." 347 S.E.2d at 276. Moreover, in *Callahan,* the affiant testified and "was subject to unfettered cross-examination," so "if [defendant] was dissatisfied with the affiant's recollection, [he] was entitled to call the magistrate to contradict or disclose other circumstances." *Id.* Here, Det. Chambers testified and was thoroughly cross-examined. As in *Callahan,* defendant chose to rely on that testimony, however, rather than calling the magistrate. This was insufficient to meet his burden.

Similarly, in *Erdman v. Superior Court,* 102 Ariz. 524, 528–29, 433 P.2d 972, 976–77 (1967), we held that it was harmless error for a magistrate not to question a police officer affiant who signed a complaint without actual knowledge of the facts stated therein because the defendant failed to show prejudice. We stated:

> Neither the magistrate nor the desk sergeant were called to determine what examination was given the sergeant by the magistrate, or to determine whatever else the magistrate might have done to satisfy himself judicially that probable cause existed for the issuance of the complaint.

102 Ariz. at 528–29, 433 P.2d at 976–77.

■ *Erdman* has been cited for the proposition that a complaint upon information and belief requires a magistrate to inquire into the foundation of the complaint.

*State v. Lynch,* 107 Ariz. 463, 464, 489 P.2d 697, 698 (1971); *Kuhn,* 154 Ariz. at 26, 739 P.2d at 1343. The case also demonstrates, however, that a defendant must present evidence to show that the magistrate did not fulfill his or her duty. In *Erdman,* the defendant did not present *any* evidence to show whether the magistrate questioned the police officer. Although the defense here did elicit Det. Chambers's lack of memory through his testimony, a witness who cannot remember is equivalent to no witness at all and does not constitute a prima facie case for suppression. The defense's interpretation of Det. Chambers's lack of memory, without more, was not sufficient.

In *State v. Raboy,* the defendant filed a motion to suppress drugs and other evidence that the state had obtained under a search warrant. The defendant argued that the state's use of information provided by an unidentified informant in its affidavit for the search warrant was unreliable, and therefore that the warrant could not have been issued upon probable cause. 24 Ariz.App. 586, 587–88, 540 P.2d 712, 713–14 (1975). At the suppression hearing, defendant called 4 witnesses, each of whom testified that he or she was not the informant and that no one else could have been the informant. Although the affiant, a police officer, testified for the state at the hearing, defendant failed to cross-examine him. The court of appeals held that defendant did not make a prima facie case for suppression because the evidence that defendant had presented regarded peripheral issues and did not address the only issue before the court on the motion to suppress: whether the affidavit supported a finding of probable cause. *See* 24 Ariz.App. at 588–90, 540 P.2d at 714–16. Here, defendant's evidence, like the evidence in *Raboy,* did not sufficiently pertain to whether Commissioner Gerst performed her required function when she issued the warrant. Rather than resting on Det. Chambers's lack of memory, defendant should have called Commissioner Gerst on that issue.

Indeed, defendant's evidence established little more than an empty record. We already have concluded that this quantum of evidence is insufficient. In *State v. Lubet-*

*kin,* the defendant argued that the magistrate bound him over on one count but that the information contained 8 counts. 78 Ariz. 91, 94–95, 276 P.2d 520, 522 (1954). We held that the defense's mere statement that the record was devoid of references to the other 7 counts was not sufficient to overcome the presumption that the magistrate performed his duty. Similarly, the mere statement that a witness's lack of recall is constitutionally significant does not make a prima facie case for suppression.

■ We emphasize that we hold only that before the state is required to prove the legality of its evidence, the defendant must establish the lack of an affidavit, lack of a transcript, and whether any of the parties to the probable cause proceeding, including the magistrate, can recall whether the magistrate made the necessary inquiry. We do not, however, decide in this opinion whether a magistrate's finding of probable cause is presumptively invalid when made without a supporting affidavit, without a record, and where the defendant shows at the suppression hearing that none of the parties can recall whether the magistrate fulfilled his or her duty to inquire into the foundation of an information and belief complaint.

### 3. Policy considerations.

In general, federal courts and many state jurisdictions follow a "warrant/no warrant" dichotomy in allocating the burden of proof. *See* 5 Wayne R. LaFave, *Search & Seizure* § 11.2(b), at 38–39 (3d ed. 1996). That is, if the challenged evidence was obtained under authority of a warrant, defendant bears the burden of going forward with some evidence to show that the challenged evidence was illegally obtained. If the challenged evidence was obtained without a warrant, the state carries the entire evidentiary burden. *Id.* This dichotomy is justifiable because the magistrate's determination of probable cause in issuing a warrant is presumed to be legal, and because shifting some of the evidentiary burden to defendants in warrant cases further encourages police to obtain warrants. *Id.* Our holding today is consistent with the warrant/no warrant dichotomy.

Moreover, requiring a criminal defendant to present some positive evidence that a magistrate failed in his or her duty to inquire into the foundation of an information and belief complaint should not open the door for police misconduct. The defendant can always call the magistrate as a witness at the suppression hearing. Magistrates who want to avoid the inconvenience of being called to testify should therefore require written affidavits or should have a record made of the proceedings. We commend and encourage such a practice. *See Kuhn,* 154 Ariz. at 26, 739 P.2d at 1343.

In a case where neither the complainant nor the magistrate can remember whether the magistrate further inquired into the foundation of an information and belief complaint, a defendant can still succeed on his or her motion to suppress. If a magistrate fails to require an affidavit or to record a probable cause proceeding and also cannot later recall what occurred at the proceeding, the magistrate's general procedures should be challenged. In *Kuhn,* neither the city prosecutor nor the magistrate could remember the circumstances surrounding the issuance of the challenged complaint. 154 Ariz. at 26–27, 739 P.2d at 1343–44. The defendant questioned the magistrate about both the complaint and the magistrate's habitual procedures for handling criminal complaints. The defendant also presented as evidence stipulations regarding the regular practices of two other magistrates. The court of appeals held that the magistrate should not have issued the complaint against the defendant. It based its holding on the differences in procedure between the magistrate who had issued the complaint and the other magistrates. Thus, although the defendant in *Kuhn* could not present evidence about the probable cause proceedings in his own case, he successfully showed that the magistrate's habitual procedures did not adequately safeguard his constitutional rights.

### 4. Defendant is not prejudiced by application of the prima facie case requirement to his case.

Applying the prima facie case requirement to this case imposes no hardship on defendant because the nature of defendant's claims placed the burden of going forward on him in any event, irrespective of our present analysis of rule 16.2(b). Challenges to the legitimacy of a warrant place the burden of going forward on the defendant. *See, e.g., United States v. De La Fuente,* 548 F.2d 528, 533–34 (5th Cir.1977). In addition, challenges to a warrant for lack of probable cause require the defendant to demonstrate the lack of probable cause. *Chin Kay v. United States,* 311 F.2d 317, 320–21 (9th Cir.1962); *Batten v. United States,* 188 F.2d 75, 77 (5th Cir.1951); *United States v. Sierra–Garcia,* 760 F.Supp. 252, 262 (E.D.N.Y.1991); *see also De La Fuente,* 548 F.2d at 533–34. Challenges to a search or seizure on the ground of pretext require the defendant to prove the existence of the pretext. *See United States v. Maestas,* 2 F.3d 1485, 1491–92 (10th Cir.1993). Finally, absent evidence to the contrary, a reviewing court assumes that a magistrate performed his or her duty to inquire into the sources of a complainant's information and into the grounds of the complainant's belief. *Lubetkin,* 78 Ariz. at 95, 276 P.2d at 522; *Kuhn,* 154 Ariz. at 26, 739 P.2d at 1343.

Here, the state assumed that it had the burden of proving the propriety of the warrant, probable cause, and by extension, the propriety of the police conduct, none of which it was required to do. In addition, had the state called Commissioner Gerst to testify, her testimony might have met defendant's burden. *See People v. Gonzalez,* 68 N.Y.2d 950, 510 N.Y.S.2d 86, 86–87, 502 N.E.2d 1001, 1001–02 (1986) (holding that the state's evidence satisfied defendant's burden to establish his standing although defendant did not present any evidence).

When the state did not call Commissioner Gerst, however, defendant should have. Through established case law, defendant was on notice that he had the burden of going forward on most, if not all, of the issues that he presented in his motion to suppress. Defendant, however, failed to present particularized evidence to meet his prima facie case requirement. *Fimbres,* 152 Ariz. at 442, 733 P.2d at 639. Therefore, the state's burden of

proving the regularity of Commissioner Gerst's determination did not arise.

Furthermore, even if defendant's burden of going forward did not require him to call the magistrate, the state's evidence demanded rebuttal. The state elicited evidence that Commissioner Gerst had asked Det. Chambers, under oath, whether he was the investigating detective and whether the complaint was based on an accurate statement of facts. In *Erdman v. Superior Court*, we stated that "where a complaint is signed by a complainant, including an officer … if the magistrate has reason to believe that it is based on other than actual knowledge he must satisfy himself, from an examination of the complaining witness and such other witnesses as he may deem necessary, that probable cause exists." 102 Ariz. at 529, 433 P.2d at 977. Under *Erdman*, the magistrate was required to decide to what extent, if any, the complaint was based upon the complainant's personal knowledge. 102 Ariz. at 526, 433 P.2d at 974.

In this case, the state showed that Commissioner Gerst inquired into the extent of Det. Chambers's personal knowledge. Without rebuttal evidence, therefore, the trial court did not abuse its discretion in finding that the state had proved the legality of the arrests by a preponderance of the evidence, as required by rule 16.1(b).

In *Erdman*, the complaint purported to be based on personal knowledge but in fact was based on "knowledge and belief." 102 Ariz. at 528, 433 P.2d at 976. Here, we encounter an "information and belief" complaint that was based, at least in part, on personal knowledge. Rather than giving undue weight to such "magic words," however, we prefer a common sense approach based on a reasonable allocation of the parties' respective evidentiary burdens.

## C. The scope of the trial court's probable cause review.

Defendant also argues on appeal that the trial court erred in conducting a de novo review of probable cause at the suppression hearing. Defendant contends that the trial court should have limited itself to determining whether Commissioner Gerst had a substantial basis for her finding of probable cause.

Without objection, the state presented testimony at the suppression hearing relating to the extent and nature of the police investigation leading up to the proceeding before Commissioner Gerst. Defendant therefore did not raise below the argument that Judge Campbell exceeded the scope of his review. In a capital case, when an argument not raised at the trial level is raised on appeal, we review for fundamental error. *See, e.g., State v. Spears*, 184 Ariz. 277, 287, 908 P.2d 1062, 1072 (1996); *State v. Cornell*, 179 Ariz. 314, 329, 878 P.2d 1352, 1367 (1994).

A trial court's task is to determine whether the totality of the circumstances indicates a substantial basis for the magistrate's decision. *Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984). The court must grant deference to the magistrate's decision. 466 U.S. at 732, 104 S.Ct. at 2088. Assuming but not deciding that the trial court considered evidence that Commissioner Gerst did not consider, we fail to see any fundamental error. The court stated that the weight of the evidence was a close question and that, had the court been making an original probable cause determination, it would have found that there was none. However, the court correctly refrained from second-guessing Commissioner Gerst's judgment and found a substantial basis for her determination.

Close cases should be resolved by giving preference to the validity of warrants. *See Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). The trial court found that Commissioner Gerst "took some evidence and made a decision with respect to reasonable cause." In addition, the court found that Commissioner Gerst had complied with the Arizona Rules of Criminal Procedure. We therefore hold that the trial court did not err in its review of Commissioner Gerst's probable cause determination.

## II. GOOD FAITH

Even if Commissioner Gerst did not fulfill her constitutional requirement to inquire into the basis of the complaint before finding

probable cause to arrest defendant, we hold that the trial court did not err in concluding that the "good faith" exception to the exclusionary rule applied to this case. *See United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984); *State v. Evans,* 177 Ariz. 201, 203, 866 P.2d 869, 871 (1994), *rev'd on other grounds sub nom. Arizona v. Evans,* 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995).

In *Leon,* the Supreme Court held that evidence obtained in objective good faith reliance on a faulty search warrant should not be suppressed. 468 U.S. at 922, 104 S.Ct. at 3420. Despite defendant's contention on appeal that *Leon* is distinguishable because it involved a search warrant instead of an arrest warrant, Judge Campbell ruled as follows:

> I can see arguments going either way. On one hand, the *Leon* case involved a search warrant where there was a detailed affidavit presented to the magistrate. We don't have a circumstance such as that here in the sense that a detailed affidavit was [not] provided.... I guess one could argue based on that that *Leon* is distinguishable.
>
> On the other hand, the magistrate did have an obligation and a duty and the authority to take evidence, took some evidence and made a decision with respect to reasonable cause.... The police were required to rely upon the determination of the magistrate in the execution of the arrest warrant in this case.
>
> So I find on balance that the good faith exception to the exclusionary rule applies in this case....

■ We hold that *Leon* applies in the arrest warrant context. This conclusion is consistent with that reached by some federal courts. *See United States v. Teitloff,* 55 F.3d 391, 393 (8th Cir.1995); *United States v. Gobey,* 12 F.3d 964, 968 (10th Cir.1993); *United States v. Fama,* 758 F.2d 834, 838 (2d Cir.1985). In *State v. Greene,* our court of appeals assumed that *Leon* did apply to arrest warrants but declined to find a "good faith" exception to an arrest under a warrant that had been quashed 8 months earlier. 162 Ariz. 383, 384, 783 P.2d 829, 830 (App.1989); *see also State v. Peterson,* 171 Ariz. 333, 339–

40, 830 P.2d 854, 860–61 (App.1991). Similarly, in *State v. Evans,* this court declined to apply the "good faith" exception to an arrest under a quashed warrant, but we did not question whether *Leon* was limited to search warrants. 177 Ariz. at 203–04, 866 P.2d at 871–72. Thus, we have implicitly extended *Leon* to arrest warrant cases. We do so now explicitly.

■ Defendant argues in the alternative that the "good faith" exception is inapposite to this case because Det. Chambers misled or recklessly disregarded the truth when he presented the complaint, and because Commissioner Gerst was not neutral and detached when she issued the warrant. Under *Leon,* 4 situations preclude application of the "good faith" exception: (1) when a magistrate is misled by information that the affiant knew was false or would have known was false but for his or her reckless disregard for the truth; (2) when the issuing magistrate "wholly abandon[s]" his or her judicial role; (3) when a warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when a warrant is "so facially deficient ... that the executing officers cannot reasonably presume it to be valid." 468 U.S. at 923, 104 S.Ct. at 3421 (internal quotations and citations omitted). Defendant's claims correspond to the first and second of these situations.

Judge Campbell made the following findings with regard to the "good faith" exception:

> [N]umber one, I think this is a close call whether probable cause exists or not.
>
> Number two, I think the police had a good faith basis to believe there was probable cause. This is not a situation where I think the police would realize [that] under no conceivable circumstances would probable cause exist.
>
> Three, I find that the magistrate did what the magistrate was supposed to do under the Arizona Rules of Criminal Procedure.
>
> Four, I find that the police had the right to rely on the warrant.

Five, police misconduct would not be furthered by applying the exclusionary rule in this case. Under these facts and circumstances, they did everything they should have done.... [They went] to an independent magistrate, had the determination made and then proceeded.

Therefore, I find the good faith exception to the exclusionary rule applies, and I find nothing improper with the execution of the arrest warrant upon [defendant].

We conclude that the trial court eliminated each of the 4 situations that preclude the "good faith" exception. First, if the police had "a good faith basis to believe there was probable cause," then the warrant was not issued on false or reckless statements. Second, if "[t]his [was] not a situation where ... police would realize [that] under no conceivable circumstances would probable cause exist," then the warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923, 104 S.Ct. at 3421. Third, if "the police had the right to rely on the warrant," then the warrant was not "so facially deficient ... that the executing officers [could not] reasonably presume it to be valid." 468 U.S. at 923, 104 S.Ct. at 3421. Finally, if the magistrate acted in accordance with the Arizona Rules of Criminal Procedure, then she did not "wholly abandon[ ]" her judicial role. Leon, 468 U.S. at 923, 104 S.Ct. at 3421.

■ Defendant argues, however, that Commissioner Gerst issued the warrant on the basis of false or reckless statements. Defendant contends that Det. Chambers was "not candid" because he should have volunteered information to Commissioner Gerst, even if she did not inquire into the basis of the complaint. However, defendant concedes that "there is no evidence that Det. Chambers provided false information to the commissioner...." We decline to interpret the first Leon exception to include an affirmative duty for police officers to volunteer information that a magistrate does not request. We concur with the Court's statement in Leon that "an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." 468 U.S. at 921, 104 S.Ct. at 3419.

Moreover, in this case, Judge Campbell found that the police had a good faith basis to believe that there was probable cause to arrest defendant and that their conduct was not unreasonable. At the suppression hearing, two detectives articulated their basis for believing there was probable cause. After reviewing their testimony, we conclude that the court did not err in finding that the police believed in good faith that there was probable cause to arrest defendant for robbery.

■ Defendant also argues that Commissioner Gerst "wholly abandon[ed]" her judicial role. This argument is inconsistent with federal case law. The issue with regard to the kind of abandonment mentioned in the fourth Leon category is not, as defendant suggests, whether the magistrate's malfeasance, misfeasance, or nonfeasance was so egregious as to constitute total disregard for her responsibilities. Rather, the issue is whether the evidence of the magistrate's conduct, or of the nature of her role, indicates that she abandoned her impartiality or was unable to act in a neutral and detached manner. See United States v. Heffington, 952 F.2d 275, 277–78 (9th Cir.1991). For example, in Lo–Ji Sales, Inc. v. New York, the Court held that a town justice who actively participated in a police investigation was not a neutral and detached magistrate. 442 U.S. 319, 326–27, 99 S.Ct. 2319, 2324–25, 60 L.Ed.2d 920 (1979), cited in Leon, 468 U.S. at 923, 104 S.Ct. at 3421. Similarly, in Connally v. Georgia, the Court held that, where a magistrate's salary was based on the number of search warrants issued, the magistrate was not neutral and detached. 429 U.S. 245, 250, 97 S.Ct. 546, 548, 50 L.Ed.2d 444 (1977). Finally, in Coolidge v. New Hampshire, the Court held that an attorney general could not also act as a magistrate because his involvement in law enforcement was inconsistent with the role of a magistrate. 403 U.S. 443, 449–51, 91 S.Ct. 2022, 2029–30, 29 L.Ed.2d 564 (1971).

■ From this line of cases, we conclude that a magistrate does not "wholly

abandon" his or her judicial role unless there is evidence of systemic or patent partiality. Moreover, because of its deterrent purpose, the exclusionary rule "necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct...." *Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974). Thus, a court should suppress evidence only upon a showing that the police knew or should have known that its actions were unconstitutional. *See United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 2317–18, 45 L.Ed.2d 374 (1975). The *Leon* Court stated the contrapositive of this rule: evidence should not be suppressed if the police acted with "objective good faith." *Leon,* 468 U.S. at 920, 104 S.Ct. at 3419. Taken together, these two rules indicate that a reviewing court should not suppress evidence taken as a result of a magistrate's error unless the magistrate "wholly abandon[ed]" his or her judicial role, or the police knew or should have known that the magistrate was acting as a "rubber stamp" for a police investigation. *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *see also United States v. Breckenridge,* 782 F.2d 1317, 1321 (5th Cir.1986); Wayne R. LaFave, *"The Seductive Call of Expediency": United States v. Leon, Its Rationale and Ramifications,* 1984 U. Ill. L.Rev. 895, 916–17. Our conclusion is consistent with the statement in *Leon* that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates.... [W]e discern no basis ... for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." 468 U.S. at 916, 104 S.Ct. at 3417; *see also State v. Atwood,* 171 Ariz. 576, 667, 832 P.2d 593, 684 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993) (Corcoran, J., concurring) ("[T]he question whether to apply the exclusionary rule is determined by weighing the extent to which its application will deter law enforce-

ment officials from committing unconstitutional acts against the extent to which its application will deflect the truth-finding process, free the guilty, and generate disrespect for the law and the administration of justice.").

■ In this case, defendant concedes that Det. Chambers did not knowingly mislead Commissioner Gerst, and we see no basis for concluding that the trial court erred in finding that the police acted in good faith. Nor do we find any evidence in support of defendant's speculation that Det. Chambers purposefully exploited the late hour in order to obtain a warrant on less than probable cause. Therefore, we hold that, if Commissioner Gerst failed in her duties, the exclusionary rule is not the appropriate remedy, and that, at any rate, Judge Campbell did not err in finding that the police acted in good faith.[7] In addition, we note that defendant did not raise any issues regarding the good faith of the Wichita police officers who executed the warrant. Those issues, if any, are waived. Moreover, we hold that the trial court did not commit error, much less fundamental error, in determining that all of the police, from Wichita as well as from Phoenix, had the right to rely on the warrant.[8]

## III. PSYCHOLOGICAL EXPERT TESTIMONY

Before trial, the state moved in limine to limit testimony by a defense psychological expert. Defendant did not file a written opposition. At trial, over defendant's objection, the court ruled that the expert could testify about defendant's personality and intellect and about the expert's opinions on the type of behavior that other people with defendant's personality and intelligence characteristics might possess, but that the expert testimony could not broach the issue of defendant's mental condition when he made his statements to the Phoenix police.

■ Defendant argues on appeal that his mental condition when he made his state-

---

7. We have reviewed the trial court's ruling de novo. *United States v. Kurt,* 986 F.2d 309, 311 (9th Cir.1993).

8. Neither party argued that we should analyze this issue under the Arizona good faith statute. A.R.S. § 13-3925. Under that statute, neither our analysis nor the result reached would have changed.

ments was probative of the voluntariness and credibility of the statements and required expert testimony and that the trial court denied him due process by limiting such testimony. We review the trial court's ruling on expert testimony for a clear abuse of discretion. *State v. Fierro,* 124 Ariz. 182, 187, 603 P.2d 74, 79 (1979).

Under rule 702, Arizona Rules of Evidence, a trial court may allow expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue...." An expert may not give an opinion as to the accuracy, reliability, or truthfulness of a witness. *State v. Lindsey,* 149 Ariz. 472, 475, 720 P.2d 73, 76 (1986).

Expert psychological testimony can be appropriate where there is a reasonable basis to believe that the jury will benefit from the testimony and the testimony "explains recognized principles of social or behavioral science which the jury may apply to determine issues in the case." 149 Ariz. at 473, 720 P.2d at 74. Expert psychological testimony also can be appropriate to demonstrate general character traits, "such as being overly protective, easily fearful, and not prone to violence." *State v. Dickey,* 125 Ariz. 163, 169, 608 P.2d 302, 308 (1980). A trial court must not exclude expert psychiatric testimony where the defendant shows the trial court, by offer of proof or otherwise, that the testimony is probative of a material issue in dispute. *State v. Gonzales,* 140 Ariz. 349, 353, 681 P.2d 1368, 1372 (1984). Expert psychological testimony is not appropriate, however, to show the actual mental state of a defendant at a given time. *Dickey,* 125 Ariz. at 169, 608 P.2d at 308.

We disagree that the expert's testimony at the presentence hearing supports defendant's contention that the trial court should not have limited the scope of his testimony. The expert testified at the presentence hearing to his opinion about defendant's state of mind during the interrogation. As we have stated, this kind of testimony is not permitted. *Lindsey,* 149 Ariz. at 474, 720 P.2d at 75; *Dickey,* 125 Ariz. at 169, 608 P.2d at 308.

At trial, the expert did testify extensively about defendant's intelligence and personality traits, which included the tendency of people with those characteristics to be easily manipulated and susceptible to the kind of questioning that led to defendant's statements. This testimony was properly admitted. *Dickey,* 125 Ariz. at 169, 608 P.2d at 308. The trial court's limitation of the expert's testimony was therefore within the parameters that we have established. We find no abuse of discretion.

## IV. TESTIMONY OF FAILED CHILD SUPPORT OBLIGATIONS

At trial, defendant's ex-wife testified over objection that defendant had been in arrears on his child support obligations for several months when the murders were committed. Defendant argues on appeal that this evidence was not relevant and that its admission was prejudicial error. We review trial court rulings on evidentiary questions for abuse of discretion. *State v. Robinson,* 165 Ariz. 51, 56, 796 P.2d 853, 858 (1990).

Before admitting prior bad act evidence, a trial court should determine that: (1) the evidence is proffered to show something other than conduct in conformity with the prior acts, pursuant to rule 404(b); (2) the evidence is legally and logically relevant under rule 402; (3) the probative value of the evidence substantially outweighs the risk of unfair prejudice under rule 403; and (4) defendant has not been denied an appropriate limiting instruction under rule 105. *See Atwood,* 171 Ariz. at 638, 832 P.2d at 655, citing *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

In this case, the trial court determined that the evidence was admissible to show motive and to rebut defendant's implication during his opening statement that he did not need money when the murders were committed. These were both proper purposes under rule 404(b). Additionally, we find no abuse of discretion in the trial court's weighing of the evidence under rule 403. Finally, the trial court offered to give a limiting instruction under rule 105, but the defense did not request one. We therefore

conclude that the trial court afforded defendant adequate protection against unfair prejudice under *Huddleston* and *Atwood* and did not abuse its discretion in admitting the child support evidence.

## V. EXCLUSION OF JURY VENIRE PERSONS

■ Before jury selection began, defendant filed a written general objection to death qualification of venire persons. "Death qualification" is the questioning of venire persons during voir dire on their attitudes about the death penalty and the effect, if any, that their attitudes would have on their performance as jurors. *See State v. Clark*, 126 Ariz. 428, 431, 616 P.2d 888, 891 (1980). Defendant later repeated his objection orally. The trial court implicitly overruled defendant's objections by selecting two voir dire death qualification questions.

Defendant argues on appeal that the trial court improperly and prejudicially excluded certain venire persons based on their answers to the death qualification questions. Defendant bases this argument on the fact that the trial court deviated from the actual wording of the selected voir dire questions and that the questions posed failed to meet the constitutional standards established in *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980), and *State v. Wiley*, 144 Ariz. 525, 533–35, 698 P.2d 1244, 1252–54 (1985), *overruled on other grounds*, *State v. Superior Court*, 157 Ariz. 541, 544, 760 P.2d 541, 544 (1988).

In *Adams*, the Supreme Court held that cause challenges to venire persons are constitutional only if the venire person's attitude about the death penalty "would prevent or substantially impair the performance of his duties as a juror...." 448 U.S. at 45, 100 S.Ct. at 2526; *see also Witherspoon v. Illi-*

*nois*, 391 U.S. 510, 519–21, 88 S.Ct. 1770, 1775–76, 20 L.Ed.2d 776 (1968). The Court reaffirmed this standard in *Wainwright v. Witt*, 469 U.S. 412, 424–25, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). In *State v. Martinez–Villareal*, 145 Ariz. 441, 449, 702 P.2d 670, 678 (1985), we stated that Arizona courts use an identical standard, allowing cause challenges when a death qualification question reveals "bias of a nature which would prevent a juror from performing his duty." In *Wiley*, we approved specific voir dire questions and a prefatory comment, and we stated that "[d]isqualification when a juror states his inability to be impartial is not only permissible but imperative...." 144 Ariz. at 534, 698 P.2d at 1253.

■ In this case, the trial court used a *Wiley* prefatory comment[9] and two other questions, one of which we also approved in *Wiley*. The *Wiley* question asked venire persons if their attitudes toward the death penalty would "prevent" them from voting for a first degree murder conviction. The second question inquired whether a venire person's feelings about the death penalty would "substantially interfere" with his or her ability to "reach an impartial judgment regarding the defendant's guilt or innocence." Taken together, the comments and questions clearly meet the *Adams* standard.

The entire venire panel heard the prefatory comment and the first question when the court posed it to the first venire person. After dismissing the first venire person based on his answer, the court posed the first question to the entire venire panel, and some members responded affirmatively. The court then posed the second question to some of these venire persons, but the court's wording of the second question was not consistent. On two occasions, the court asked if the

---

9. The prefatory remark was as follows:
    If you were selected in this case, you will be instructed that you should not discuss or even consider the possible penalty or sentence that may be imposed in determining whether the Defendant is guilty or not guilty. If the Defendant was found to be guilty of murder in the first degree by the jury, then the Court—that's the judge—may impose either life imprisonment or the death penalty as a sentence. Those two options, if you will.

    Under Arizona law the jury does not determine the sentence. The sentence—what the sentence ought to be for any offense, including murder first degree, is entirely a function of the judge, the court.
    This language closely resembles the prefatory comment that we approved in *Wiley*. *See* 144 Ariz. at 533, 698 P.2d at 1252.

venire person's attitude "might" affect his or her ability to perform as a juror. To another venire person, the court asked if the venire person "could not vote to convict." All of the venire persons who had responded affirmatively to the first question also responded affirmatively to the second question and were dismissed.

The court then continued to voir dire the panel, asking each venire person if he or she had heard the first death qualification question and if he or she would have responded affirmatively to it. To some of the venire persons who said they would have responded affirmatively, the court then posed the second question but again altered it, asking, for example, whether the venire person's attitude "might affect," "would interfere," or "would create a problem" with the fulfillment of his or her duties as a juror, or if the venire person "would have a problem" fulfilling those duties.

Defendant argues that the court's reformulations of the second question prejudiced him by allowing the state to conserve its peremptory strikes and by removing from the jury panel jurors who could have altered the perspective of the entire jury. During jury selection, however, defendant did not object to any of the questions that the trial court posed or to the court's decision to strike any of the venire persons based on their responses.

■ Defendant now contends that his general objections to death qualification were sufficient and that he did not need to repeat those objections during jury selection. We disagree. Defendant's objections to death qualification in general cannot extend to his argument on appeal that the trial court erroneously and prejudicially dismissed certain jurors for cause. These are different issues. Indeed, defendant explicitly states that he does not now contest the trial court's decision to death qualify the jury. We therefore hold that defendant waived the death qualification issue, and we will uphold the trial court's decision unless the court committed fundamental error.

■ Our review of the record persuades us that the trial court understood the standard for excluding venire persons based on their attitudes toward the death penalty, and we defer to its decision to strike the challenged venire persons. *See Wainwright v. Witt*, 469 U.S. 412, 425–26, 105 S.Ct. 844, 853, 83 L.Ed.2d 841 (1985). The court stated that "the bottom line is whether [a juror] can be fair and impartial, despite any feelings [he or she] might have about the death penalty." This is a correct restatement of the *Adams* and *Wiley* test. Although the court struck "substantially" from the second question, defense counsel waived any argument that doing so was error when he told the trial court that, although he maintained his general objection to death qualification, he accepted the court's modifications. Furthermore, because of the order in which the court posed its questions, it was not error to modify the second question in this context, whether the modification was in the form of excising "substantially" or in the other forms that the court used. The first question, which the court posed to each venire person, reflected the higher standard: whether the venire person's attitude would "prevent" him or her from performing as a juror. Being "prevented" from performing as a juror necessarily includes being "substantially impaired," "impaired," or affected. Therefore, once a venire person responded affirmatively to the first question, the second question was superfluous, no matter how it was worded. The court did not commit error.

## VI. REASONABLE DOUBT INSTRUCTION

■ Defendant argues on appeal that the trial court's reasonable doubt instruction was fundamental error because it excluded possible doubt from the meaning of reasonable doubt. Defendant did not object to the instruction at trial. We therefore review the instruction for fundamental error. *State v. Gendron*, 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991).

■ The trial court instructed the jury on reasonable doubt using the Recommended Arizona Jury Instruction (RAJI) Standard Criminal 5. Giving this instruction is not fundamental error. *State v. West*, 176 Ariz. 432, 444 & n. 3, 862 P.2d 192, 204 & n. 3

(1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994). In *State v. Portillo,* we adopted a new reasonable doubt instruction that is different from the RAJI 5 instruction. 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995). The new instruction was to be used beginning no later than January 1, 1996. 182 Ariz. at 596, 898 P.2d at 974. That instruction therefore has no bearing on this case. Moreover, in *Portillo* we stated that the RAJI 5 definition "satisfies due process and does not provide these or any other defendants in past cases a basis for claiming error." 182 Ariz. at 596, 898 P.2d at 974.

## VII. LESSER INCLUDED OFFENSE INSTRUCTION

■ Without objection, the trial court instructed the jury:

> The crime of First Degree Murder by premeditation includes the less serious crime of Second Degree Murder. You may find the Defendant guilty of the less serious crime only if you find unanimously that the State has failed to prove the more serious crime beyond a reasonable doubt, but has proved the less serious crime beyond a reasonable doubt.

On appeal, defendant argues that this instruction violated his right to due process under the Fifth Amendment [10] to the United States Constitution and article II, section 4 of the Arizona Constitution. In *State v. Wussler,* we upheld a similar instruction. 139 Ariz. 428, 429–30, 679 P.2d 74, 75–76 (1984). Defendant now requests that we consider whether a *Wussler* instruction violates due process. However, having waived the argument by his failure to object at trial, defendant must show that the instruction as given affected the foundation of his case or denied him a right essential to his defense, and he has not done so. 139 Ariz. at 430, 679 P.2d at 76. Giving this instruction is not fundamental error.

---

10. We assume that defendant meant to argue that the instruction violated his due process rights under the Fourteenth Amendment to the United States Constitution, which prohibits the states, as opposed to the federal government, from "depriv[ing] any person of life, liberty, or property, without due process of law."

---

■ As in all death penalty cases, this court independently reviews the record to determine the presence or absence of aggravating and mitigating circumstances and the weight to be accorded each. *State v. Nash,* 143 Ariz. 392, 404, 694 P.2d 222, 234 (1985). The trial court found that the state proved beyond a reasonable doubt the existence of 3 aggravating circumstances: (1) that the murders were committed with the purpose of obtaining pecuniary gain, A.R.S. § 13–703(F)(5); (2) that the murders were committed in an especially heinous and depraved manner, § 13–703(F)(6); and (3) that the murder of each victim occurred during the murder of the other, § 13–703(F)(8). Defendant challenges the (F)(5) and (F)(6) aggravating circumstances. As part of our independent review, we have considered the (F)(8) circumstance as well, and we affirm the finding. *See State v. Greenway,* 170 Ariz. 155, 167–68, 823 P.2d 22, 34–35 (1991) (explaining that the (F)(8) aggravating circumstance applies to multiple murders). We now discuss the (F)(5) and (F)(6) circumstances.

## VIII. PECUNIARY GAIN

Defendant challenges the trial court's determination beyond a reasonable doubt that the murders were committed in expectation of pecuniary gain. A.R.S. § 13–703(F)(5). The trial court found the following facts in support of its determination. The murders were committed at a place of business, which was a family-owned store. The victims were the proprietor of the store and a family member who regularly helped at the store. Both victims habitually carried cash. The murders occurred toward the end of the business day when the cash register would have contained the cash from the day's transactions. When their bodies were discovered, the victims' pockets did not contain paper money, and Ginger Lee's purse was missing. The cash register contained no cash. Based

on these facts, the trial court concluded that the motive for the murders was to facilitate the commission of a robbery or theft with respect to any or all of: (1) Ginger Lee's purse; (2) John Lee's pockets; and (3) the contents of the cash register.

On appeal, defendant argues that the evidence does not support the trial court's determination. We disagree. A court may find pecuniary gain as an aggravating factor if the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder. *State v. Spencer*, 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993), *cert. denied*, 510 U.S. 1050, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994). A finding of pecuniary gain may be based on tangible evidence or strong circumstantial inference. *State v. Gillies*, 135 Ariz. 500, 512, 662 P.2d 1007, 1019 (1983). Pecuniary gain need not be the exclusive cause for a murder. *Greenway*, 170 Ariz. at 164, 823 P.2d at 31. However, a court may not find pecuniary gain on the mere finding that "a person has been killed and at the same time defendant has made a financial gain." *State v. Correll*, 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986).

As the trial court found in this case, the murders were committed at the end of the business day, and both Ginger Lee and John Lee habitually carried significant amounts of cash. Some cash was taken from the store's cash register and probably from the Lees. In addition, defendant's ex-wife testified at trial that defendant was in arrears on his child support obligation and that he had been in arrears for a number of months. Defendant also told a fellow prisoner, who testified at trial, that he and Jake needed money and that they had discussed their need for money before entering the Joyland Market. Moreover, defendant told the Phoenix police that he "wouldn't deny" committing a theft in the store. The attempt to take Ginger's purse occurred before the murders. We therefore find that the murders were committed in expectation of pecuniary gain.

## IX. ESPECIALLY HEINOUS OR DEPRAVED

Defendant also challenges the trial court's determination beyond a reasonable doubt that the Lee murders were especially heinous or depraved. A.R.S. § 13–703(F)(6). The court based its determinations on the following facts. Both victims were essentially hacked to death with an instrument consistent with defendant's Bowie knife. The victims' skulls were shattered by multiple blows with a blunt instrument. Most of the blows occurred after the victims were on the floor in a defenseless state. The number of blows constituted needless and gratuitous violence beyond that necessary to cause death. Based on these facts, the court concluded that the victims were helpless, that the murders were senseless, and that the acts of gratuitous violence indicated a total lack of regard for human life.

On appeal, defendant argues that the evidence does not support the trial court's determination. Section 13–703(F)(6) establishes an aggravating circumstance for murders committed "in an especially heinous, cruel or depraved manner." Because the list is stated in the disjunctive, the state must prove only one element to establish the (F)(6) factor. *State v. Murray*, 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995).

Heinousness and depravity focus on "a killer's vile state of mind at the time of the murder, as evidenced by the killer's actions." *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 9 (1983). In determining whether a crime is especially heinous or depraved, we may look to the following factors: (1) apparent relishing of the murder; (2) infliction of gratuitous violence on the victim clearly beyond that necessary to cause death; (3) mutilation of the victim's body; (4) senselessness of the crime; and (5) helplessness of the victim. 135 Ariz. at 52–53, 659 P.2d at 10–11. In addition, a finding that a murder was committed to eliminate a witness can support a finding of heinousness and depravity. *State v. Ross*, 180 Ariz. 598, 606, 886 P.2d 1354, 1362 (1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995).

Senselessness and helplessness are less probative of the defendant's state of mind than are relishing, gratuitous violence, and mutilation. *Murray*, 184 Ariz. at 37–38, 906 P.2d at 570–71. Only in limited circumstances will a finding of senselessness and helplessness, without more, support a finding of heinousness and depravity. *State v. King*, 180 Ariz. 268, 287, 883 P.2d 1024, 1043 (1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995). If no circumstances "separate the crime from the 'norm' of first degree murders," a court should not find that the murder was especially heinous or depraved. *Gretzler*, 135 Ariz. at 53, 659 P.2d at 12.

In this case, the trial court based its heinousness and depravity finding on: (1) gratuitous violence, (2) senselessness, and (3) helplessness. In addition, the trial court found that the murders were committed to eliminate potential witnesses. We analyze each element separately.

## A. Gratuitous violence.

We concur with the trial court that the Lee murders involved infliction of gratuitous violence. Gratuitous violence is violence inflicted upon a victim clearly beyond that necessary to cause death. *Greenway*, 170 Ariz. at 166, 823 P.2d at 33. In this case, defendant confessed to the jailhouse informant that he beat John Lee on the head with his Bowie knife until bone was visible and Lee was bleeding profusely. He also stated that Jake had hit Ginger Lee with his fist and that Ginger was on the floor while defendant was attacking John Lee. The bludgeoning continued after both victims were dead with their skulls shattered from the force of the repeated blows. Ginger suffered 8 such blows, and she lived long enough to inhale some blood. John Lee also sustained multiple blows to the head. The medical examiner testified that Lee probably died shortly after the attack began. In both cases, the blows were delivered with sufficient force not only to shatter the bone but to cut and tear the brain tissue by forcing the bone fragments into it. Defendant subjected the victims to violence far beyond that necessary to cause their deaths. We hold that defendant's repetitive bludgeoning of both victims was an act of gratuitous violence.

## B. Helplessness.

We also concur with the trial court's determination that the victims were helpless. John Lee was 72 when he died and was small in stature. Ginger Lee was 50 when she died, and she, like her father, was of small stature. John Lee was struck as he fell to the ground, and the bludgeoning continued after he was down. Ginger was on the ground before John Lee and was also struck while she was down. Because of their age, size, and because both victims had been subdued and were on the ground before the most vicious attacks began, we hold that the victims were both helpless.

## C. Senselessness.

A murder is senseless if it is unnecessary for the defendant to complete his objective. *Ross*, 180 Ariz. at 605, 886 P.2d at 1361. Defendant argues that the trial court's finding that the murders were committed to eliminate potential witnesses is inconsistent with its finding that the murders were senseless. Although we conclude that the evidence does not support a finding that witness elimination was a motive for the murders, *see infra* Part IX.D, we disagree with defendant's argument. After the victims had been subdued, the murders were totally unnecessary to completing the objective of committing theft. Theft is a different objective from evading detection, arrest, and prosecution. We hold that the Lee murders were senseless.

## D. Elimination of witnesses.

The trial court found that the murders were committed in order to eliminate potential witnesses. Witness elimination is given some weight in determining whether a murder is especially heinous or depraved. *Ross*, 180 Ariz. at 606, 886 P.2d at 1362. However, the witness elimination factor only applies if: (1) the victim witnessed an unrelated crime and was killed to prevent testimony about that crime; (2) a statement by the defendant or other evidence of the defendant's state of mind shows that witness elimi-

nation was a motive; or (3) some extraordinary circumstances show that the murder was motivated by a desire to eliminate witnesses. *State v. Barreras*, 181 Ariz. 516, 523, 892 P.2d 852, 859 (1995).

In the instant case, the trial court did not state its reasons for finding that witness elimination was a motive for the murders. Our independent review of the record does not reveal sufficient facts to conclude beyond a reasonable doubt that the murders were committed to eliminate witnesses. The Lees were not witnesses to an unrelated crime. Neither defendant's statements nor other evidence indicates that the motive was to eliminate witnesses. We find no extraordinary circumstances indicating that witness elimination was a motive. We therefore overturn the trial court's finding that the murders were committed to eliminate witnesses.

We uphold the trial court's determination that the (F)(6) aggravating circumstance applies to this case. We find that the murders were especially heinous and depraved because they were senseless, involved gratuitous violence, and the victims were helpless.

## MITIGATING CIRCUMSTANCES

In addition to the statutory mitigating circumstances listed in A.R.S. § 13–703(G), the sentencing judge must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less than death might be appropriate." *State v. McCall*, 139 Ariz. 147, 162, 677 P.2d 920, 935 (1983). The defendant must prove the existence of mitigating circumstances by a preponderance of the evidence, and the trial court has discretion to decide how much weight to give each mitigating circumstance that the defendant proves. *State v. West*, 176 Ariz. 432, 449, 862 P.2d 192, 209 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994).

The defense presented the following evidence in mitigation: (1) defendant's statements to the Phoenix police were not admissions; (2) defendant did not admit involvement in the murders to the jailhouse informant; (3) defendant's good character; (4) defendant's diminished mental capacity; and (5) defendant's complete psychological profile. The defense's evidence at the presentence hearing, both to rebut the state's aggravation evidence and to prove mitigation, was mainly presented to show that there was insufficient evidence that defendant committed the murders. The defense seemed to argue that defendant should receive a lesser sentence because, despite the jury verdicts, there is a reasonable doubt about whether defendant committed the murders. Thus, the defense asked the trial court to consider as mitigation that the state purportedly changed its theory of defendant's culpability after Jake's trial ended in an acquittal. The defense generally chose not to present evidence on the statutory mitigating factors because these circumstances, according to counsel, "contemplate that the person admits that they committed the[ ] murders ... and [defendant] did not commit the murders...."

The trial court found that defendant had failed to prove each of the statutory mitigating circumstances. Specifically, the court found: (1) that defendant's low Intelligence Quotient and his classification as "learning disabled" in school did not affect his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, A.R.S. § 13–703(G)(1); (2) that defendant was not under duress, § 13–703(G)(2); (3) that defendant was legally accountable for the conduct of another, but his participation was not relatively minor because he was physically present at the Joyland Market when the burglary and murders occurred, he was an active participant, and the jury found him guilty of first degree premeditated murder, § 13–703(G)(3); (4) defendant could reasonably have known that his conduct would cause, or would create a grave risk of causing, death to another person, § 13–703(G)(4); and (5) defendant's age, which was 28 at the time of the murders, was not a sufficiently substantial mitigating circumstance to call for leniency, § 13–703(G)(5).

We have reviewed the evidence presented in mitigation at the presentence hearing, and we have reviewed the record for additional mitigation. We have considered the testimony of defendant's family and acquaintances that he was a non-violent person before the commission of these offenses. We find that defendant proved his good character by a preponderance of the evidence. However, we also find that this evidence pales in comparison with the violent nature of the Lee murders, and we accord it little if any weight.

■ With regard to defendant's claim that he did not commit the murders and, by implication, that Jake's acquittal should be a mitigating circumstance, we have held that an unexplained disparity in sentences between codefendants can be a mitigating circumstance. *See State v. Schurz,* 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993). However, when a murder is especially cruel, heinous, or depraved, even an unexplained disparity receives little weight in mitigation. 176 Ariz. at 57, 859 P.2d at 167. In this case, the disparity is not unexplained. A jury acquitted Jake of his murder charges, whereas another jury convicted defendant of two counts of premeditated first degree murder. We therefore conclude that the different results of defendant's and Jake's trials is not a mitigating circumstance.

■ Defendant did not include his habitual substance abuse on his disclosure statement, rule 15.2(g), Arizona Rules of Criminal Procedure, did not raise it as mitigation at the presentence hearing, and did not raise it on appeal. He therefore did not meet his burden of proof on that issue. However, the state did present expert testimony at the presentence hearing relating to defendant's impairment, his history of substance abuse, and to the lack of effect of his history of substance abuse on his statements to the Phoenix police in Wichita. The state's evidence does not help defendant meet his burden of proof on this issue. But even if it did, we would find his history of substance abuse to be of so little weight that it does not alter our conclusion that the mitigation in this case is insufficiently substantial to call for leniency.

## ENMUND/TISON FINDINGS

■ In *Enmund v. Florida,* 458 U.S. 782, 801, 102 S.Ct. 3368, 3378–79, 73 L.Ed.2d 1140 (1982), the Supreme Court held that, before the death penalty can be imposed, there must be a finding that defendant killed, intended to kill, or attempted to kill. In *Tison v. Arizona,* 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), the Court stated that, in the case of felony murder, "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement."

■ In the instant case, the trial court did not make a specific *Enmund/Tison* finding. However, in rejecting minor participation as a mitigating circumstance, the court found that the trial evidence demonstrated that defendant was at the Joyland Market and that he was an active participant in the murders. Defendant has not argued that the court's failure to make *Enmund /Tison* findings is prejudicial error. In this case, the jury verdicts can substitute for the *Enmund /Tison* findings because the jury found defendant guilty of both counts of premeditated first degree murder after having been instructed on felony murder as well. *See Atwood,* 171 Ariz. at 649–50, 832 P.2d at 666–67; *West,* 176 Ariz. at 452, 862 P.2d at 212.

■ In addition, *Enmund /Tison* findings may be made by the trial court or by this court on review of the record. *See State v. Runningeagle,* 176 Ariz. 59, 64, 859 P.2d 169, 174, *cert. denied,* 510 U.S. 1015, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993) (finding *Enmund /Tison* requirement in the substance of the trial court's special verdict). We now hold that defendant meets the *Enmund /Tison* culpability requirement. Although defendant has argued that he did not commit the Lee murders, the jury found him guilty on two counts of premeditated first degree murder. In addition, the blood spatter expert at trial concluded that a single person committed the murders. The medical examiner testified that the murder weapon was consistent with defendant's Bowie knife. Defendant was present at the scene and ad-

mitted to striking John Lee with his Bowie knife until bone was visible. We therefore conclude that defendant killed John Lee and then killed Ginger.

### INDEPENDENT REVIEW

In death penalty cases, this court independently reviews any aggravating and mitigating circumstances to determine whether the death penalty was properly imposed. *State v. Gulbrandson,* 184 Ariz. 46, 67, 906 P.2d 579, 600 (1995). Accordingly, we have reviewed the entire record, considering and independently weighing all of the aggravating and mitigating evidence presented. *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797 (1992). We find the following aggravating circumstances: (1) defendant committed the murders for pecuniary gain, A.R.S. § 13–703(F)(5); (2) the murders were especially heinous and depraved, § 13–703(F)(6); and (3) defendant was convicted of two homicides that were committed during the same offense, § 13–703(F)(8). We also find that defendant's non-violent past is a non-statutory mitigating circumstance. In our reweighing, we find that the mitigating circumstances are not sufficiently substantial to call for leniency. *See* A.R.S. § 13–703(E).

### CONSTITUTIONAL CHALLENGE TO THE DEATH PENALTY

Defendant argues that A.R.S. § 13–703, the death penalty statute, violates the Eighth Amendment to the United States Constitution because it does not adequately channel the sentencing judge's discretion. We previously have rejected this argument. *E.g., State v. Spencer,* 176 Ariz. 36, 45, 859 P.2d 146, 155 (1993).

### DISPOSITION

We have independently reviewed the record for fundamental error and have found none. *State v. Kemp,* 185 Ariz. 52, 67 & n. 1, 912 P.2d 1281, 1296 & n.1 (1996). Accordingly, we affirm defendant's convictions and sentences.

### MANNER OF EXECUTION

The trial court sentenced defendant to death by lethal gas. However, the offenses for which defendant is sentenced to death occurred before November 23, 1992. By statute, defendants sentenced to death for an offense committed before November 23, 1992, shall, at least 20 days before the execution of sentence, choose either lethal injection or lethal gas, and if a defendant fails to choose, he or she shall be executed by lethal injection. A.R.S. § 13–704(B) (Laws 1993, Ch. 2, § 1, effective Feb. 11, 1993) (West Supp.1995). We therefore reverse that part of the trial court's sentence ordering execution by lethal gas, and we order that execution will proceed in the manner prescribed in A.R.S. § 13–704(B) as amended.

MOELLER and MARTONE, JJ., concur.

ZLAKET, Vice Chief Justice, dissenting.

I respectfully dissent. Great care should be taken to avoid mixing facts from the police investigation, the multi-issue pretrial hearing, and the trial itself, thereby cloaking the magistrate's probable cause finding with more credibility than it deserves. In my view, the record clearly indicates that before the warrant for defendant's arrest was obtained, the police were unable to develop sufficient evidence upon which to legitimately charge him with any crime. Because the officers could have presented to the magistrate only that which was known by them at the time, it is irrefutable that any evidentiary showing had to be deficient. Moreover, I disagree with the assertion that defendant failed to meet his initial burden of proof in this regard, and fear that today's decision will make it all but impossible to challenge a magistrate's probable cause finding where there is an absence of documentation and little or no available recollection of events.

In this case, there is no record of what transpired before the magistrate. No affidavit or other supporting paperwork is in the official file. We have only the police officer's testimony that he cannot recall what, if anything, he said or was asked before obtaining the warrant for defendant's arrest. An examination of the flimsy evidence possessed by investigators *at that time,* however, illustrates the highly questionable nature of the proceeding.

## THE EVIDENTIARY BASIS
## FOR THE WARRANT

On March 8, 1991, John and Ginger Lee were found in a back corner of the Joyland Market, both having died as a result of blunt force injuries to the head. The store's cash register was empty, and Ginger Lee's purse was missing. A receipt found in the register showed that someone had rung up many items but never totalled them. No physical evidence at the crime scene linked defendant to the murders.

Two days later, an anonymous informant advised police that a Jake Johnson, defendant's half-brother, and a black man named Kevin were involved in the killings. Officers located Kevin and searched his home. They also learned that Johnson was a white male whose parents lived in the general vicinity of the market.

A married couple reported having seen two white men near the market around the time the police believed the murders took place. These witnesses said one man was 20 to 25 years old, 5'8" to 5'10" tall, 125 to 130 pounds, clean-shaven, with brown curly hair. They described the other as 40 to 50 years old, 5'10", 160 pounds, with medium-length blonde, brown, or red curly hair, and wearing a black and red flannel shirt. Jake Johnson generally fit the second description, except that he was only 23 years old. Defendant, David Hyde, did not match either description, and it is undisputed that he had a beard and mustache when the crimes were committed. The witnesses did not describe facial hair on either man.

Officers learned from a former roommate of defendant and Jake that the two men were often in the company of one another, that they had relocated to Wichita, Kansas on or about March 10, and that this move had been planned by them for some time. Thereafter, the police showed photographs of the brothers to the married couple. These witnesses recognized Jake but could not identify defendant until an officer put his thumb over the beard and mustache in the picture. The wife then thought that defendant might look like one of the people they had seen.

The police further learned from the roommate that Jake had occasionally bragged about stealing a red Mustang convertible from a homosexual man at knife point, and at one time had actually possessed such a car. They confirmed that a red Mustang had been reported stolen in January 1991. The vehicle was recovered about a week after the report. Fingerprints lifted from the car were found to match those of Jake and Kevin. Defendant's fingerprints were not then available, but a later comparison showed that none of those in the automobile matched his. According to the official account of this incident, the victim was assaulted and robbed by a man who picked him up in the Nu–Town Saloon. After they left the bar in the convertible, the assailant instructed the victim to pull over, struck him with a closed fist, took his wallet, and drove away.

On March 15, officers interviewed the robbery victim. From a photographic lineup, he identified Jake as resembling a man with whom his assailant stopped to talk on their way out of the bar. He gave a description of the assailant that was very generally consistent with defendant—a Caucasian in his mid–20s, 6'1", and 160 pounds. The victim made no mention of facial hair, however, and he could not identify defendant from a photograph even after an officer covered up his beard. According to a detective's testimony at the suppression hearing months later, the victim also indicated that his assailant had dark hair, which was consistent with defendant's. On cross-examination, however, the detective admitted that this information was not recorded in any document connected with the investigation and came entirely from his memory. The police also later claimed that their suspicions were based, in part, on the fact that the Mustang had been stolen near the home of defendant's parents, where he sometimes visited.

This, then, is everything the police knew and all the evidence they had at 4:30 p.m. on March 15 when Detective Mike Chambers sought arrest warrants for defendant and Jake on robbery and theft charges.

## THE FRUITS OF THE WARRANT

Virtually all of the significant evidence against defendant in the present case flowed

from his arrest. This, of course, was the clear objective of the police, who from the outset paid almost no attention to the crime that was the subject of the warrant; they were unmistakably investigating the Lee murders. To this end, they immediately impounded and searched the brothers' vehicles.

The physical evidence obtained was inconclusive at best. In defendant's car, police found a small amount of blood and a black down jacket that had a blood smear across the front. Luminol testing also revealed scant traces of blood on the tan jacket defendant was wearing when arrested. In Jake's vehicle, officers discovered a Bowie knife that later tested positive for a small quantity of blood near the hilt. Examiners could not determine the age of these blood samples. Moreover, only that found on the black jacket was confirmed as being of human origin, but it could not be identified as having come from either of the Lees. At the home where the brothers were staying, officers recovered a plaid shirt generally matching descriptions of that worn by one of the men observed outside the store on the night of the murders.

The critical evidence against defendant came from his statements while in custody. Phoenix detectives interrogated him in Wichita for approximately six hours on the evening of March 17. They spent little time on the robbery incident and moved quickly to the subject of the Lee murders. Initially, defendant denied being in the store on the night of the crimes. The officers replied that an eyewitness had seen him there and that they had enough evidence to convict him of both murders. Neither statement was true.

Defendant thereafter claimed that if he was seen on the premises, he must have been suffering from one of his alcohol-induced blackouts. By the end of the interrogation, however, defendant had given piecemeal statements that generally added up to the following inculpatory story: *If* people had seen him there, and *if,* as the officers insisted, the eyewitnesses could not be mistaken, then he "couldn't deny" being there, and he agreed with detectives that he and his brother "could have" gone to the Joyland Market on the night of the murders to pick up some food for their trip to Kansas; *if* they went there for that reason, both of them "would have" gone into the store; *if* a cart full of groceries was found at the checkout stand, as detectives informed him, he was probably the one who pushed it there, although they "could have both switched off"; *if* he was at the checkout counter, it probably "would have" been manned by Mr. Lee, as it "usually" was on previous occasions when he had been in the store, although "it could have been the lady, too"; *if* he did not pay for the groceries, as detectives assured him, then he "must have" given the money to Jake; and *if* neither of them paid, something must have happened to interrupt the transaction.

For a long while, defendant could not progress past the idea of being at the cash register, which he described as "something being put in my head." He was then falsely informed that his fingerprints were found on the shopping cart. He began to insist that he did not even remember seeing the face of a "Japanese man" and once more denied being in the store. After a detective spoke to him at length, however, defendant again could picture himself in the market and remembered pushing the basket and talking to Mr. Lee.

Eventually, defendant stated that he may have been "shocked out of" his memory of later events if he had seen something that scared him. After being shown a picture of the crime scene, defendant acknowledged he "may have" heard noises, "probably" screaming or yelling, "probably" from both Jake and "the lady." He repeatedly stated that Mr. Lee "probably" went to the back to help his daughter, at which point he "probably just grabbed the bags and just left." The detectives suggested that perhaps one of the Lees did something to provoke him or his brother. Defendant finally agreed with the suggestion that Ms. Lee may have caught Jake trying to steal her purse. He said Jake "probably just went wild." Defendant also admitted owning the knife found in his brother's vehicle, which matched the description of the weapon a witness had said Jake carried "constantly."

Defendant recanted his statements the next day. He told the detectives that he was not at the store, although "you guys had me

just about convinced that I was there." He insisted that he was at his parents' house at the time of the murders and suggested that another man might have been the person seen with his brother that night. A psychiatric expert later testified that defendant had a below-average IQ, was extremely susceptible to suggestion, and easily manipulated.

On April 4, 1991, defendant and Jake Johnson were indicted on two counts of first degree murder and one count of first degree burglary. Charges were also twice brought against defendant for the robbery involving the red Mustang, the crime for which he was supposedly arrested in the first place, *but both times they were dismissed.* Jake, however, eventually pleaded guilty to theft, a class 3 felony, in connection with that matter.

## THE PRETRIAL HEARING

Prior to trial, defendant moved to suppress the statements he made during the interrogation because they were fruits of an unlawful arrest. He argued, in part, that the robbery warrant lacked probable cause and was merely a pretext to gather evidence on the Lee incident. At an extensive hearing designed to resolve this and other pretrial motions, witnesses outlined the state's evidence. It is undisputed that this presentation of facts exceeded anything that was or could have been shown to the magistrate at the time of the warrant application. It is also undeniable that the hearing, which required four days of testimony, was intended not only to determine if probable cause existed for Hyde's arrest warrant, but also whether Wichita police officers were aware of the warrant at the time of the arrest, whether they received valid consent to search Jake's vehicle, whether both Phoenix and Wichita police acted in good faith, whether defendant's and Jake's separate statements were voluntary and admissible under *Miranda,* and whether their trials should be severed.

The superior court concluded that the "nub of the probable cause issue" had to do with the robbery victim's description of his assailant, which the judge said matched not only defendant but "one-quarter of the males in Maricopa County," including himself. He opined that the evidence connecting defen-

dant with the robbery was extremely weak. In fact, he stated that had he been charged with the original determination of probable cause, he would not have issued a warrant for defendant's arrest. He nevertheless denied the motion to suppress because he thought reasonable persons could differ on the sufficiency of the evidence presented to him. He also concluded that the police officers acted in good faith.

## THE TRIAL

The brothers were tried separately. Jake's trial was held first, on the state's original theory that he had committed the murders and defendant was essentially a bystander. However, Jake's confession was excluded at trial because detectives had continued to question him after he requested an attorney, and he was acquitted. At defendant's trial, the state's position drastically changed. The prosecutor argued that although Jake might have knocked Ginger Lee out, defendant killed both victims with the Bowie knife while Jake was turning out the lights. A redacted but highly inculpatory transcript of defendant's statements to the police was admitted in evidence, and corresponding portions of the tape-recorded interrogation were played for the jury. Defendant was convicted of the premeditated first degree murders of John and Ginger Lee.

## SENTENCING

The trial court considered in mitigation defendant's age, mental status, and intelligence level. The judge also specifically noted testimony from defendant's friends, family, and others that he had never acted violently. The judge did not find, however, that the mitigating evidence was sufficiently substantial to call for leniency.

## DISCUSSION

Before arresting defendant, the police clearly did not have probable cause to assert that he was involved in the Lee murders. The only evidence implicating defendant was the anonymous tip that his brother had been involved, a highly questionable photo identification of both men, *see, e.g., State v. Alexan-*

*der,* 108 Ariz. 556, 562–66, 503 P.2d 777, 783–87 (1972), and the fact that they quit their jobs and went to Kansas shortly after the killings—a move that indisputably had been contemplated for some time.

Based on testimony at the suppression hearing, it is clear that the investigating officers were searching for ways to obtain more evidence regarding the homicides. The police declined an offer from defendant's stepfather to have both men flown back from Kansas to answer questions. Instead, they wanted to arrest the brothers in Kansas, in their cars, as Detective Chambers's testimony indicates:

> [Defense Counsel]: And you figured the cars were there in Wichita, too, right?
>
> [Chambers]: I expected they probably would [sic] and they wouldn't fly them back.
>
> Q: And you suspected there might be some evidence of these crimes, right?
>
> A: That's correct.
>
> Q: And that's why you didn't want to separate the two, because it would be difficult to get a search of the vehicles in Wichita if the two men were here, correct?
>
> A: I don't know about the difficulty in getting a warrant or not, but I am sure it would create some difficulty in preserving the evidence.
>
> Q: At any rate, you wanted to maintain—or have the two individuals remain where the vehicles were, right?
>
> A: I think that's accurate.

Before applying for the warrant, Phoenix police had requested that Wichita officers set up surveillance of the brothers in Kansas. They told these officers that if they picked up the brothers for anything, they should look for bloody clothing and a knife, evidence clearly relating only to the murders.

As previously indicated, once defendant was in custody, the officers spent little time questioning him about the car robbery and instead moved almost immediately to the subject of the homicides. Furthermore, the owner of the home where Jake had been arrested was told that the brothers were being taken in connection with a murder in Arizona. The police obviously were focused all along on defendant's suspected involvement in the killings but knew that they had nothing to justify the issuance of a warrant for those crimes.

In their zeal, detectives decided to arrest defendant for the unrelated robbery, despite a similar shortage of evidence connecting him to that crime. As the state conceded at oral argument before this court, the only basis police had for suspecting defendant was that he approximated the victim's description of his assailant and was sometimes found in his brother's company. It is settled, however, that general descriptions and mere association are not enough to establish probable cause for an arrest. *See, e.g., Sibron v. New York,* 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) (association with known narcotics addicts is not in itself sufficient to establish probable cause); *State v. Mendez,* 115 Ariz. 367, 369, 565 P.2d 873, 875 (1977) (same); *Commonwealth v. Jackson,* 459 Pa. 669, 331 A.2d 189, 191 (1975) (general description not enough to support arrest warrant).

Nevertheless, Detective Chambers hurriedly sought these warrants at 4:30 on a Friday afternoon. He acted so hastily that he did not have the necessary paperwork in order. No warrant form was attached to the complaint, and detectives had to scramble to locate one. They also apparently did not have time to find a proper warrant, because the form finally used was for a justice of the peace court rather than the superior court in which the magistrate presided. Finally, the officers used the same form for both warrants. Thus, one of the documents on its face authorized police to arrest Jake for robbery, a class 4 felony, even though the underlying complaint charged him with theft, a class 3 felony. Beyond any doubt, these proceedings were conducted on short order.

It is clear that the magistrate had a duty to "inquire as to the sources of the complainant's information and the grounds for [his] belief." Rule 2.4 cmt., Ariz.R.Crim.P.; *see State v. Lynch,* 107 Ariz. 463, 464, 489 P.2d 697, 698 (1971). This requirement is not merely procedural; it has deep constitutional roots. Article 2, sections 4 and 8 of the

Arizona Constitution and the Fourth Amendment to the United States Constitution compel a magistrate to determine whether complaints are supported by probable cause. Before issuing a search or arrest warrant, a judicial officer must "be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971); *see State v. Currier*, 86 Ariz. 394, 399, 347 P.2d 29, 33 (1959). The magistrate "should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime." *Giordenello v. United States*, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958); *see Lynch*, 107 Ariz. at 464, 489 P.2d at 698. Indeed, one who issues a warrant without performing a probable cause inquiry merely acts as a "rubber stamp" for the police in violation of federal and state constitutional protections. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *see Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 2333, 76 L.Ed.2d 527 (1983). Unfortunately, by articulating an almost insurmountable presumption of correctness and enlarging the defendant's burden beyond that which any sensible interpretation of the law requires, today's opinion renders the foregoing fundamental principles meaningless.

Because probable cause determinations are typically conducted without benefit of an official reporter, and thus no transcript is available to reviewing courts, other documentation becomes quite important. *See Callahan v. State*, 179 Ga.App. 556, 347 S.E.2d 269, 276 (1986) (encouraging recordation of magistrate warrant hearings). The majority not only tolerates a complete absence of evidence tending to show that correct procedures were followed in this case, but it also ignores facts strongly suggesting the contrary. The state has done nothing to establish that the magistrate complied with appropriate mandates. *See* Rule 16.2(b), Ariz.R.Crim.P. (state must show "by a preponderance of the evidence, the lawfulness in all respects of the acquisition of all evidence which [it] will use at trial"). This burden is always on the prosecution; it never shifts to the defendant. *State v. Hocker*, 113 Ariz. 450, 455 n. 1, 556 P.2d 784, 789 n. 1 (1976), *overruled on other grounds, State v. Jarzab*, 123 Ariz. 308, 311, 599 P.2d 761, 764 (1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1069, 62 L.Ed.2d 789 (1980). While the initial obligation of going forward may be on the defense, *see Kuhn v. Smith*, 154 Ariz. 24, 26, 739 P.2d 1341, 1343 (1987), it is only required to produce "evidence of specific circumstances which establish a prima facie case that the evidence taken should be suppressed." Rule 16.2(b), Ariz.R.Crim.P. I believe defendant easily met this test.

An arrest warrant can be supported by a "complaint, any affidavits filed, and any testimony taken." Rule 2.4, Ariz.R.Crim.P. The complaint presented here was constitutionally deficient on its face. It generally averred, based on "information and belief," that defendant had committed a robbery but recited no facts justifying that claim. *See Whiteley*, 401 U.S. 560, 91 S.Ct. 1031 (finding inadequate a complaint containing only a conclusion that named individuals perpetrated described offense). Moreover, it was unaccompanied by the customary affidavit detailing evidence upon which a finding of probable cause could be based. Thus, the only way in which the requisite showing could have been made was through the testimony of Detective Chambers. All signs, however, clearly point in the opposite direction.

Contrary to the majority's suggestion, this is not a case in which the accused has made baseless assertions or has relied solely on an empty record to show that the magistrate acted inappropriately. *See State v. Lubetkin*, 78 Ariz. 91, 95, 276 P.2d 520, 522 (1954) (presumption of regularity not rebutted by mere showing of empty record). In addition to establishing that the conclusory complaint was unsupported by affidavit or other written documentation, defendant produced evidence suggesting that the magistrate very likely did not ask for facts and Detective Chambers probably did not volunteer any:

> [Defense Counsel]: Did she ask you questions about the complaint?

[Chambers]: There was a problem as far as there not being a document she expected there to be—and I remember a conversation about that. . . . I don't recall any thing specific about the circumstances that she asked me otherwise.

Q: You don't recall that she asked you any questions about the facts supporting the complaint?

A: I recall her swearing to me the accuracy of the facts supporting the complaints, but I don't recall a specific question of any kind.

Q: I'm not sure I'm understanding your answer. . . . Are you saying you don't recall these specific questions, or you don't recall whether she asked you specific questions?

A: I guess in part both. I don't recall a specific question that she may have asked, or that in fact she asked me questions. . . .

Q: All right, you don't recall her asking questions. Do you recall . . . yourself relating the facts to Commissioner Gerst about what had happened, about what support you had for the criminal complaint?

A: I may have.

Q: My question is whether you recall that?

A: No, not specifically.

Following a four-day interruption in his testimony, Detective Chambers returned to the stand and admitted that he had believed all along that the complaint listed facts establishing probable cause:

Q: Detective, I had asked you what, if any, questions Commissioner Gerst had asked of you when you signed a complaint?

A: I believe I had already testified that my only specific recollection was of there not being a piece of paper, and I believe it was the warrant itself, in the packet that I presented her. I don't recall if she had other questions period.

Q: You don't recall that she asked you any questions about the facts supporting the complaint?

A: No, I don't.

Q: Did you give her something in writing setting out some facts to support the complaint?

A: Yes, I did.

Q: What was it?

A: It was the direct complaint prepared by the Maricopa County Attorney's Office given to me to hand carry to her office.

Q: Well, did you have something besides the complaints, something that set out a factual basis?

A: I thought the complaint had a factual basis like a synopsis.

I find incredible the state's contention that this testimony shows that the magistrate asked questions but the detective just could not remember their specific nature. I also cannot agree that the officer's equivocal claim that he "may have" related facts to the magistrate means that he did so. In my mind, Chambers's testimony raises far more questions than it answers with respect to the propriety of this warrant. It plainly suggests that the magistrate may not have asked anything about specific facts and strongly implies that the officer provided little or nothing to support a probable cause determination. Moreover, his erroneous assumption that the complaint contained a sufficient factual basis further reduces the likelihood that Chambers personally related any facts to the magistrate; he apparently thought there was no need to do so. Regardless, any showing of probable cause attempted by the detective had to have been deficient considering the skimpy evidence he possessed at that time.

The trial judge essentially concluded that the magistrate must have taken evidence because she was required to do so. The majority makes the same leap of faith. I submit, however, that defendant's showing was more than sufficient to rebut the presumption of regularity. Thus, if there was any need to call the magistrate as a witness, that obligation had plainly shifted to the state.

In this regard, the majority mistakenly relies on *Callahan v. State*, 179 Ga.App. 556, 347 S.E.2d 269 (1986). That case is distinguishable. In *Callahan*, a written affidavit,

supplemented by the police officer's unrecorded oral testimony, was provided to the magistrate in support of the warrant's issuance. At a later suppression hearing, the affiant described the factual showing he had made before the magistrate, which the trial court deemed sufficient to establish probable cause. Because the defense claimed that the officer had not actually presented such testimony to the magistrate, the appellate court observed: "[I]f [defendant] was dissatisfied with the affiant's recollection [of what he told the magistrate], [defendant] was entitled to call the magistrate...." *Id.* 347 S.E.2d at 276. In context, this assertion is quite correct but has little or no application to the present case, where there is neither an affidavit nor evidence that the magistrate was told anything.

What may be significant about *Callahan* for our purposes is that the Georgia appellate court deemed it appropriate to evaluate the affidavit and oral testimony based on what the police knew at the time they applied for the warrant. It also expressed a clear preference for recordation or other documentation of all proceedings in which warrants are sought. *Id.* I believe we should do nothing less. *See* A.R.S. § 13–3914(C) (oral testimony in support of a *search* warrant must be recorded).

I am perplexed by the trial judge's conclusion that although he would not have found probable cause to issue the warrant, reasonable minds could differ. The state conceded at oral argument that this judge heard much more evidence than had been presented to the magistrate. Nevertheless, the court was obligated to limit itself to a consideration of only those facts previously placed before that judicial officer. *Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 2085–86, 80 L.Ed.2d 721 (1984); *see Gates*, 462 U.S. at 238, 103 S.Ct. at 2332. "A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless." *Whiteley*, 401 U.S. at 565 n. 8, 91 S.Ct. at 1035 n. 8. Given the paucity of evidence known by the police when the warrant was issued, I believe it highly improbable that the trial judge restricted his inquiry to those facts.

The majority disposes of this significant issue by again presuming regularity. It also relies on the assertion that defendant waived the matter by failing to specifically object. As noted earlier, however, the scope of the pretrial hearing was not limited to the narrow question of whether probable cause existed for the arrest warrant. All participants were aware of this. In an efficient and cost-effective manner, the trial court allowed extensive testimony regarding every legal issue to be decided. Some of this was received from witnesses who resided out of Arizona but were summoned for the hearing. While one cannot criticize the judge's decision to hear everything at once, it was incumbent upon him to utilize an appropriate legal standard in deciding each issue. *See Walton v. Arizona*, 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990) ("Trial judges are presumed to know the law and to apply it in making their decisions."). Having received more information than could possibly have been provided to the magistrate, he was obligated by law to disregard the excess in ruling on the probable cause challenge. This was understood by the parties, as the record clearly reflects. I find no waiver.

The majority's fall-back position seems to be that even if defendant met his initial burden, the trial court should not have suppressed the evidence because the police acted in good faith. *See United States v. Leon*, 468 U.S. 897, 913, 104 S.Ct. 3405, 3415, 82 L.Ed.2d 677 (1984). I disagree. Even *Leon* approves of the exclusionary rule in the following situations: (1) when warrants are issued on the basis of false or reckless statements in the affidavits; (2) when the issuing magistrate "wholly" abandons his or her judicial role; (3) when a search warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) when a warrant is "so facially deficient ... that the executing officers cannot reasonably presume it to be valid." *Id.* at 923, 104 S.Ct. at 3421.

The majority holds that the second restriction does not apply unless there is evidence of systemic or patent partiality. It relies in large part on a case cited by *Leon* as an example of judicial abandonment. *See Lo–Ji*

*Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) (magistrate actively involved in police investigation). I am persuaded, however, that if a magistrate fails to require evidence of probable cause, whether routinely *or* in an individual case, such conduct is tantamount to an abandonment of his or her judicial role. *See United States v. Decker*, 956 F.2d 773, 777 (8th Cir. 1992) (magistrate who didn't read warrant affidavit not "neutral and detached"); *State v. Miller*, 282 N.C. 633, 194 S.E.2d 353, 356–57 (1973) (same). Any other interpretation of *Leon* would effectively gut the Fourth Amendment's requirement that a magistrate have a substantial basis for his or her decision, and therein lies the danger of the majority's holding. It essentially leads to a *conclusive* presumption of propriety, thus rendering review a futile and meaningless gesture.

With respect to the third restriction, the majority asserts that the trial court "did not err in finding that the police believed in good faith that there was probable cause to arrest defendant for robbery." *Ante* at 274, 921 P.2d at 677. In reaching this conclusion, it affirms the lower court's determination that this was not a situation in which Detective Chambers and his colleagues would realize that under "no conceivable circumstances" could probable cause exist. In my judgment, this finding is both factually flawed and legally irrelevant. The proper test to be applied is whether the officers' reliance on the warrant was *objectively* reasonable, *Leon*, 468 U.S. at 922, 104 S.Ct. at 3420, not whether they conceivably could have believed that there was adequate cause to support it.

A reviewing court must look at the totality of the circumstances in determining reasonableness. For example, in *State v. Coats*, 165 Ariz. 154, 158, 797 P.2d 693, 697 (App. 1990), the court found that although the trial judge should not have issued a search warrant, reasonably well-trained officers could rely on it because there had been an affidavit containing factual, albeit stale, information. *Id.* at 159, 797 P.2d at 698. I respectfully submit, however, that no trained police officer should be entitled to claim ignorance of the Fourth Amendment's prohibition against a warrant issued on the bare assertion that a certain person has committed a crime. *See United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975), *cited in Leon*, 468 U.S. at 919, 104 S.Ct. at 3419 (finding suppression appropriate when the police have knowledge or can be charged with knowledge that arrest was unconstitutional). That is precisely what appears to have occurred here.

The majority argues that if the magistrate failed to ask questions, Detective Chambers was not to blame. *See Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974) (purpose of exclusionary rule assumes that police act willfully or negligently in depriving defendant of some right); *State v. Greene*, 162 Ariz. 383, 384, 783 P.2d 829, 830 (App.1989) (if police act deliberately or negligently, ends of exclusionary rule furthered). It adopts the state's contention that this detective had personal knowledge of the case, was ready and willing to provide it, and should not be penalized for the magistrate's failure to ask questions. I again disagree. Even under the state's scenario, the officer is not blameless. If he was ready and willing to present the facts, he should have done so. He had served as a police officer for over 23 years and knew or should have known that the magistrate could not lawfully issue a warrant solely on the basis of a cursory complaint. *See State v. Williams*, 184 Ariz. 405, 408, 909 P.2d 472, 475 (App.1995).

Furthermore, nothing in this record supports the existence of a reasonable belief on the part of the authorities. Chambers and his fellow officers had to know they were "skating on thin ice." All of the evidence suggests that they decided to take a chance on getting a magistrate to issue the warrant and hurriedly presented the matter at a late hour. They were at least negligent in failing to determine that the complaint contained no supporting facts. More likely, they had to know that there was little or nothing upon which to base a warrant for defendant's arrest. I therefore conclude that *Leon*'s good faith exception does not apply. *See id.*, 468 U.S. at 923 n. 24, 104 S.Ct. at 3420 n. 24 ("Nothing in our opinion suggests, for example, that an officer could obtain a warrant on

the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search.").

Finally, I cannot conclude that the admission of defendant's statements was "harmless beyond a reasonable doubt." *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *State v. Fulminante*, 161 Ariz. 237, 245, 778 P.2d 602, 610 (1988) (noting that Arizona courts follow the *Chapman* test). Defendant's statements were clearly damaging and not merely cumulative of other evidence. *See Harrington v. California*, 395 U.S. 250, 253–54, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *State v. Hensley*, 137 Ariz. 80, 88–89, 669 P.2d 58, 66–67 (1983). Although his cellmate's testimony corroborated many of defendant's statements to police, that witness's credibility was subject to serious attack. He not only testified as part of a plea bargain, but the defense was able to bring out inconsistencies between what he said and evidence at the crime scene. His testimony would have been far less convincing standing alone. Additionally, the only other direct evidence against defendant was one witness's courtroom identification of him. The defense, however, used an earlier description to impeach her. The rest of the evidence was largely circumstantial. I also believe it noteworthy that the investigating police officers were convinced that Jake Johnson was responsible for the murders until their own improper interrogation techniques caused the trial judge to exclude Jake's extensive statements. The prosecutor shared this view until he was unable to convict Jake.

I am sensitive to the ongoing debate surrounding the judicial exclusion of relevant evidence on constitutional grounds. The rhetoric is bound to be even more heated in a case like this, where two innocent people have tragically lost their lives. It is not my intention to suggest that proper police work should be punished or that the guilty should be set free. I strongly believe, however, that we cannot allow the end to justify the means. Because I fear that today's opinion sends the opposite message and unreasonably narrows the scope of important constitutional protections, I must dissent.

FELDMAN, Chief Justice, dissenting.

I fully concur in Justice Zlaket's dissent and write separately only to argue for adoption of a prophylactic rule to ensure compliance with constitutional requirements.

Once a defendant has raised a substantial question of compliance with constitutional requirements for issuance of a warrant, then, as Justice Zlaket suggests, the government must demonstrate that there was a valid basis for the warrant. In the present case, the documents filed to support issuance of the warrant establish nothing because they contain no facts—nothing more than the ultimate conclusion that the affiant believes Defendant was the perpetrator.

In my view, when the papers the government files to procure issuance of a warrant are facially insufficient to establish probable cause, the burden should be on the government to provide evidence of what occurred before the magistrate. Although we should not make the issuance of warrants more difficult than necessary, surely a government that has the obligation of observing constitutional checks on its actions ought to be required to assume the burden of providing a record showing compliance, which in this case means probable cause. That record could be a sworn complaint, affidavits, a court reporter's transcript or tape recording of the proceedings before the magistrate, or credible testimony from the officer or officers who appeared before the magistrate.

If, as in this case, the state is totally unable, by any means, to provide a record that it complied with Ariz. Const. art. II, § 8, we should simply hold that there was no probable cause. Anything else imposes an impossible burden on the defendant, allows post hoc rubber stamping of government action, and encourages slipshod, or worse, police work. That, in my view, is the result of the position taken in the majority opinion. I respectfully dissent.